247 A.2d 298.

EDWARD LANTINI *vs.* MALCOLM L. DANIELS *et al.*

NOVEMBER 7, 1968.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

PER CURIAM. This is a petition for certiorari to review the decision of the personnel appeal board of the city of Cranston sustaining the action of the mayor of that city ordering the removal of the petitioner from his position as a patrolman in the classified service in the municipal police department pursuant to the provisions of sec. 14.07 of the city charter. We issued the writ and in compliance therewith the pertinent records have been certified to this court.

574

The decisive issue raised by this proceeding is whether the decision of the respondent board is supported by competent evidence. If it is not, the decision is void, but if the record contains competent evidence to support the findings, this court, on certiorari, does not weigh the evidence or disturb the board's decision. We merely examine the transcript to determine if there is some legal evidence to support the board's findings. *Hooper* v. *Goldstein,* 104 R. I. 32, 241 A.2d 809; *Henry* v. *Thomas,* 100 R. I. 564, 217 A.2d 668; *Fox* v. *Personnel Appeal Board,* 99 R. I. 566, 209 A.2d 447; *Howland* v. *Thomas,* 98 R. I. 470, 204 A.2d 640; *Morgan* v. *Thomas,* 98 R. I. 204, 200 A.2d 696; *Gartsu* v. *Walsh,* 89 R. I. 256, 152 A.2d 225.

Although the record certified to us contains a lengthy transcript and many exhibits, we shall discuss only those portions thereof which we consider relevant to the issues before us. The petitioner was a member of the permanent police department of the city of Cranston. On September 24, 1965, he was involved in an automobile accident while directing traffic in the course of his duties. He was hospitalized for a period of approximately two weeks. After his discharge he remained under the care of a neurosurgeon who continued to treat him up to the time of the hearing before us. At the neurosurgeon's suggestion, petitioner consulted with a psychiatrist who first saw him on May 9, 1966, and thereafter continued to treat him for approximately one year until April 4, 1967.

From September 25, 1965, until August 3, 1967, petitioner, at the city's request, had been examined by several doctors, including a neurosurgeon and the Cranston city physician. It also appears from the transcript that during this two-year period the then chief of police on more than one occasion, on the basis of his own observation and on the basis of the city physician's recommendation, asked petitioner to report to work. The petitioner refused to do so on the

advice of one of his counsel. The petitioner testified in substance that his attorney had checked with his doctors and that they said he was not capable of returning to the police department at that time, which he stated was February, March or April in 1966. He also testified that he was still being treated by his neurosurgeon and that his psychiatrist had advised him that he should not return to police work.

Finally, on August 3, 1967, the chief of police ordered petitioner to report to work on August 7, 1967. He based his order partially upon the report of the neurosurgeon who had examined petitioner at the city's request, and upon the opinion of the city physician that there was nothing wrong with petitioner. The petitioner did not report to work as ordered; nor did he communicate with his superiors. When one of his superiors went to his house on August 7, 1967, to find out why he had not complied with the chief's order, petitioner told him that his doctor advised him not to report.

On August 11, 1967, petitioner was served with a notice of removal from the department for violation of rules 2, 7 and 8 of the department's rules of conduct. Specifically, he was charged with failure to obey a lawful and proper order, being absent from duty without official leave, and not being punctual. The petitioner filed a timely appeal to the personnel appeal board and requested a hearing before the board.

The evidence before the board consists of a copy of the rules of conduct of the Cranston police department, the testimony of the chief of police and petitioner, the testimony of a witness to the accident, the testimony of certain private investigators who had checked on petitioner's activities at various times during the period of his absence from work, certain letters, the medical testimony of certain doctors who had examined or treated petitioner, and sev-

eral medical reports. The medical testimony on the question of petitioner's ability to return to his work is in direct conflict. For the purpose of this proceeding, in view of our rule on certiorari, we need only refer to the conflicting testimony of petitioner's psychiatrist and the city physician. We do this because there is no serious claim by petitioner or any of the doctors that he was neurologically or physically unable to work. The main thrust of petitioner's claim is that as a result of the accident on September 24, 1965, he was afraid to do any work connected with the police department and that he was psychiatrically unable to do such work.

The petitioner's psychiatrist, who had last examined him on April 4, 1967, testified that, based on his observation of petitioner and petitioner's medical history, it was his opinion to a reasonable medical and psychiatric certainty that petitioner was totally disabled from performing his duties as a police officer and that he would never be able to return to such duties.

The city physician, who is a specialist in pediatrics and children's diseases, testified that he examined petitioner several times up to August 1967. He was asked whether at the conclusion of his examination of petitioner he had formed an opinion as to whether or not petitioner "* * * was capable of performing the duties of a Cranston policeman as you understood those duties." He replied that he "* * * always thought he was fully capable, and told him so many times." He also testified, in part, as follows:

> "I told him the best thing for him to do was * * * go to work * * *. He believed he was incapable of going to work so much so, and so long, that now he believed it himself. I said, 'Now why don't you reverse that attitude and make up your mind that you can go to work.' It would be like a little occupational therapy."

After the hearing the board rendered a written decision

in which they reviewed the testimony and exhibits before them. They concluded that neither petitioner's psychiatrist nor his neurosurgeon had convinced them that as of August 7, 1967 petitioner was physically or mentally incapable of carrying out the chief's order that petitioner report for work. They expressly stated that they resolved all of the conflicting medical testimony in favor of the opinion given by the city physician. They found that the chief's order was proper, that petitioner as of August 7, 1967 suffered no physical or mental disability which prevented him or relieved him from obeying the chief's order. Accordingly, they concluded that petitioner did not obey the lawful order of the chief of police, that his dismissal was based on just cause, and therefore they sustained the mayor's order discharging petitioner from the police department.

The petitioner's first point is that the record lacks competent credible evidence upon which the board could rest its decision that petitioner was dismissed for just cause. He points to the city physician's testimony that he had no education or training in the field of psychiatry and to the meagre written record of examinations of petitioner kept by the city physician. From this he argues that the city physician was not in a position by training, experience or from his knowledge of the facts in this case to pass on the capacity or ability of petitioner to respond to orders. On this record, he argues, there is no competent medical evidence to support the board's finding that petitioner was able to comply with the chief's order.

It seems to us that what petitioner is saying is that since he based his inability to return to his police work on a mental condition, the city physician was not competent to testify on his capacity or ability to work because he lacked training or experience in the field of psychiatry. We can-

not agree with this contention. As the court said in *Trout v. Gandy*, 424 P.2d 52, 54 (Okl. 1967):[1]

"Claimant infers, but does not seriously argue, that Dr. M's report of June 3rd was not entitled to probative weight because he is a physician and surgeon, but not a specialist in psychiatry. However, the majority view is that a physician and surgeon, though not a specialist in diseases of the mind, is nevertheless competent to testify as an expert regarding mental condition or matters of insanity. 20 Am. Jur. *Evidence,* Sections 851 and 865; 32 C.J.S. *Evidence* §546 (101) (c); 54 A.L.R. 863; *Baldridge* v. *Zigler,* 103 Okl. 219, 229 P. 831. The report of Dr. M, being squarely in conflict with the reports of claimant's medical experts, created an issue of fact on the question of claimant's mental condition which the State Industrial Court resolved in respondent's favor. * * *"

The city physician, being a qualified doctor of medicine in good standing in the medical profession, was competent to testify on the question of petitioner's capacity and ability to return to his police work. His lack of training or experience in the field of psychiatry may affect the weight of his testimony, but not his competency to testify. The board expressly relied on his opinion testimony and rejected that of petitioner's neurosurgeon and psychatrist. This was a weighing of evidence with which, under our rule on certiorari, we cannot interfere even though, if we were the factfinders, we might be inclined to give more weight to the testimony of petitioner's medical witnesses.

We have also considered petitioner's challenge of the adequacy of the city physician's records. This too relates to the question of the weight of his testimony and not to its competence. The petitioner also argues that the city physician made certain uncomplimentary remarks about the field of psychiatry, but a reading of the transcript shows

---

[1]For a discussion of this subject see also 2 Wigmore, *Evidence* (3d ed.) §569, pp. 665-666.

that he recognized psychiatry as a substantial field of medicine and that his opinion was not influenced by a disregard for that field of medical science.

In his brief, as well as in his oral argument, petitioner argues strenuously that the board overlooked and entirely disregarded the opinion testimony and record of the neurosurgeon engaged by the city to examine the petitioner. This neurosurgeon, who examined petitioner in the presence of the city physician, testified that:

> "The neurological examination, as I remember it, was entirely normal.
> \* \* \*
>
> "From a neurological point of view, he could practically be engaged in almost any type of work."

He also testified that he discovered "\* \* \* a peculiar pattern of abnormality on the left side of his body which did not appear to be consistent with any type of neurological abnormality." His medical report, which he sent to the city physician and which is in evidence, concludes with the following statement:

> "As far as his working capacity is concerned, I could state that neurologically, he is able to return to work at any time. However, because of his non-organic symptoms and signs, I do feel that such a recommendation may come only from a psychiatrist."

This report is in substance a summary of the neurosurgeon's testimony before the board. It is this report, as well as the oral testimony which it summarizes, which petitioner now argues the board overlooked and disregarded. As we have previously indicated the board examined all of the medical evidence, but in arriving at their ultimate finding, they accepted and relied on the testimony of the city physician.

It appears from the transcript that sometime in the fall of 1966 petitioner was examined, at the request and expense of the city, by a psychiatrist selected by the city. This

psychiatrist was not presented as a witness by the city, nor was any medical report of his offered in evidence. The petitioner now claims that the only inference which can be drawn from this is that the psychiatrist's testimony would have indicated that petitioner was disabled. This contention is without merit. As the court said in *Higgins* v. *Mycroft,* 80 R. I. 118, 123, 92 A.2d 727, 729:

> "* * * the failure to produce an available material witness to testify may be considered as a circumstance, but the inference to be drawn and the weight to be given thereto is ultimately for the trier of facts to determine upon a consideration of all the evidence. The cases in this state have consistently followed this pattern whether applied to a party or a witness. * * * None of these cases holds that a trier of facts is compelled as a matter of law to draw an unfavorable inference from a party's mere failure to produce a material witness. For a general discussion of this point, see annotation 135 A.L.R. 1375 *et seq.*"

In the case at bar the board knew of the examination in question and of the city's failure to present the psychiatrist as a witness. Upon a consideration of all the evidence they drew therefrom no inference adverse to the city. The fact that they did not mention this in their decision is immaterial. Even if we assume that this doctor's testimony would have been adverse to the city, it is abundantly clear, as we have already stated, that the board relied heavily on the city physician's testimony and rejected evidence to the contrary. Compare *DiMaio* v. *Del Sesto,* 102 R. I. 116, 122, 228 A.2d 861, 864.

There is no merit to petitioner's contention that the decision of the board is grounded upon mistakes or misstatement of facts. The board's finding that the accident in which petitioner was involved was "minimal" is supported by the testimony of an eyewitness. We have carefully examined all the contentions made by petitioner in point II of his brief but find no merit in any of them. Nor is there

any merit to petitioner's contention under point III in his brief that the board's decision is against the law.

We come finally to petitioner's contention that the charges against petitioner were multiplicious in nature. Although the order of removal by the mayor was based on petitioner's alleged violation of three separate rules of conduct of the Cranston police department, the board based their decision only on the first, namely, violation of rule 2, failure to obey a lawful and proper order. The board did not rule on the remaining two alleged violations. The petitioner contends that the multiplicity of charges prejudiced him before the board because they could not help but be influenced by the "battery of charges" presented.

The case at bar is distinguishable from *Hooper* v. *Goldstein, supra*. In each case the multiple charges arose from a single incident, but in the instant case, unlike *Hooper,* the board, after having found that the petitioner had violated the first charge made against him, did not pass upon the remaining charges. Additionally, in the case at bar, the board made and disclosed basic findings upon which it premised its ultimate finding. On this record we find that no prejudice has inured to the petitioner as a result of the multiple charges.

The petition for certiorari is denied and dismissed, the writ heretofore issued is quashed, and the records certified to this court are ordered returned to the respondent board with our decision endorsed thereon.

*David F. Sweeney,* for petitioner.

*Peter Lawson Kennedy,* Assistant City Solicitor, for respondents.