410 A.2d 1340.

STATE *vs.* RONALD D. ARPIN.

FEBRUARY 7, 1980.

PRESENT: Bevilacqua, C.J., Kelleher, Doris and Weisberger, JJ.

644

BEVILACQUA, C.J. The defendant, Ronald D. Arpin (Arpin), was tried before a jury in the Superior Court and convicted of second-degree murder. Before the Superior Court the defendant relied on the defense of lack of criminal responsibility by reason of insanity. On appeal the defendant

assigns as error a number of the trial justice's rulings. He also urges us to grant him a new trial under the American Law Institute's (ALI) test for legal insanity, the test this court recently adopted in *State* v. *Johnson*, 121 R.I. 254, 399 A.2d 469 (1979).

At about 2:45 p.m. September 19, 1974, as twelve-year-old Kristen Judge got off the school bus in front of her home on Howard Hill Road in Foster, Rhode Island, she noticed a white Volkswagen van parked on the opposite side of the road. A few minutes later, Kristen walked from her house out to the road to meet a friend who was coming over for a visit. As the two young girls walked back to Kristen's house, they passed the van and saw a man and a young woman kissing beside the van. A short time later, they came back down the driveway and heard a girl scream. Concerned, the girls returned to the house and asked Kristen's father if he had heard the scream. Although he had heard nothing, he accompanied the girls back out to Howard Hill Road. Seeing that the van had now gone, the girls proceeded along toward the Foster fairgrounds. While in front of the fairgrounds, they saw the Volkswagen van again, first heading toward Foster, and then about a minute later heading back to the spot where it had been parked when Kristen first noticed it.

At about the same time, Mrs. Linda Tramontano, who also lived on Howard Hill Road, heard some noise in the woods next to her home. She also heard a car door slam several times and then the spinning of wheels. She walked out to the road and saw the white Volkswagen van stuck in a ditch and defendant trying to figure out how to free the van from its predicament. Apprehensive because she was alone and thinking that defendant might come to use her telephone, Mrs. Tramontano called the Foster Highway Department for assistance. Two members of the department arrived shortly at her house. While she spoke to them outside, defendant walked up, explained that his van was stuck, and asked for help. The road men and defendant then walked back down to the van.

At about 3:30 p.m., in response to Mrs. Tramontano's report of the suspicious vehicle, a Foster police officer arrived at the scene. While the road men had been inspecting the problem, defendant entered the van. As the officer tried to help him out, defendant seemed very agitated, gasping for breath, muttering, and struggling. The officer handcuffed him, and the road men restrained him on the ground. While restrained, defendant muttered that he had picked up a male and a female hitchhiker and that they had given him some white powder that "worked fast." Believing that defendant might need some medical assistance for drug intoxication, the police officer called for an ambulance and also a wrecking crew. The defendant continued to mumble about the hitch-hikers, saying that the man had been beating up the girl. When the medical crew arrived, they strapped the struggling defendant to a stretcher. Meanwhile, the wrecker operator, who had walked into the woods, came out and reported that he had found a female body, partly naked, badly beaten, and bloodied.

The ambulance crew drove defendant to the State Police headquarters in Scituate for interrogation as a suspect in the girl's murder. The defendant originally stated that he had picked up the girl and a man named "Donald," and that "Donald" had beaten the girl. During the interrogation, however, defendant was informed that the two young girls had seen the young woman with only one man, who fit defendant's description. The defendant then abruptly changed his story, confessing that he, and not "Donald," had struck the girl. The police recorded the confession.

The defendant was charged with murder, assault with intent to rape, and assault with a dangerous weapon. After a psychiatric hearing, however, he was declared incompetent to stand trial and was placed in the custody of the Department of Mental Health, Retardation and Hospitals for seventeen months. Before the trial commenced almost two years later, defendant filed various pretrial motions, including a motion to suppress his confession. The trial justice denied this motion and, over defendant's objection, admitted the taped

confession into evidence. At trial, defendant relied principally on an insanity defense and presented expert witnesses who testified to his mental state at the time of the homicide. At the conclusion of the state's case, the charge of assault with a dangerous weapon was dismissed. The jury found defendant not guilty of assault with intent to rape, but found him guilty of murder in the second degree, and sane.

## I

We turn first to defendant's contention that in denying the motion to suppress the taped confession, the trial justice committed reversible error. The defendant argues that the waiver of his constitutional privilege against self-incrimination was not knowingly, intelligently, and voluntarily made. *Johnson* v. *Zerbst,* 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938). The defendant claims specifically that at the time he signed the waiver-of-rights form and gave the confession, he lacked the mental capacity to understand the implications and consequences of signing the waiver form. *See id.; State* v. *Espinosa,* 109 R.I. 221, 283 A.2d 465 (1971).

At the pretrial hearing on defendant's motion to suppress the waiver-of-rights form and the confession, Captain Edward D. Pare and Detective Norman Pineau, two police officers, testified that they talked to Arpin at State Police headquarters on September 19, 1974. Captain Pare testified that he first saw Arpin at 4:25 p.m. being removed from the ambulance handcuffed and strapped to a stretcher, and noted that at the time defendant was squirming and appeared excited. After the medical crew released defendant and removed the handcuffs, he accompanied Pare to his office in the police station, where two other officers joined them. Before asking any questions, Pare informed Arpin that he was a murder suspect, informed him of his constitutional rights, and gave him the warnings set out in *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Arpin responded, "I know all that," and said that he understood the warnings. Captain Pare described Arpin's demeanor in the office as "somewhat calm" and "coherent." The defendant initially told the fabricated story of "Donald"

in a rational, coherent manner, according to Pare.[1] Captain Pare also testified that he used no force or coercion and made no threats or promises. Captain Pare concluded the initial interview at about 5:15 or 5:30 p.m. and asked Detective Pineau to continue the interrogation.

Detective Pineau and another officer introduced themselves and once again advised Arpin of his constitutional rights. When asked if he understood the warnings and whether he wished to waive the right and proceed, Arpin responded, "I do not need any type of attorney. I'm a witness. I saw what happened." Arpin then signed the waiver-of-rights form and repeated the story of "Donald" that he had related previously to Pare. At that time, however, an important development occurred. Captain Pare reentered the office and said that a young female eyewitness had stated that only one man and one girl were in the van. He also said that the man she described was Ronald Arpin. At this point, Arpin said, "Okay I want to tell the truth. I want to get this over with."

After asking all but Pineau to leave, defendant admitted that he was "Donald" and had committed the acts he had attributed before to "Donald." Detective Pineau interrupted him because of the inculpatory nature of Arpin's statements, and Arpin was read his rights for the third time. Arpin nodded that he understood his rights and once again agreed to waive them. Detective Pineau described Arpin at this time as "very quiet, very passive." Arpin proceeded to tell a revised story involving only him and Dorene McKenzie.[2]

---

[1] Arpin said that after he left work, he had picked up a male and a female hitchhiker. He also said he picked up a second hitchhiker, who got off near Wauregan. Later, the male and the female hitchhikers got into an argument in the van, and the man, "Donald," slapped the girl once or twice. Arpin said that he pulled the van over to the side of the road near Foster, where "Donald" and the girl continued their quarrel in the woods. Arpin tried to intercede, but not before he saw "Donald" strike the girl with a rock. He said that he tried to help the girl who was lying limp on the ground but fled when "Donald" came at him. Arpin then went to seek assistance to get his van out of the ditch.

[2] Apparently, Arpin picked up Dorene McKenzie near her high school in Connecticut. Arpin claimed that she gave him the impression that she would have sexual relations with him, and it was for this reason that he stopped along the road near Foster. He said that in the woods she became reluctant, thereby making him very angry, and that he lost control of himself before he struck her with a rock.

Although defendant refused to reduce the story to writing or to sign any statement, he agreed to allow the police to tape it. Before any statement was recorded, Arpin was advised of his constitutional rights for the fourth time. Detective Pineau asked defendant if he wished to waive the rights and give the statement. Arpin responded affirmatively.

The defendant called only one witness, Dr. Herbert Myers, who was qualified as an expert in psychiatry. Doctor Myers testified that he had examined Arpin to determine his competency to stand trial.[3] Before the examination, Dr. Myers had scrutinized Arpin's medical and psychiatric history and had ordered psychological tests. Doctor Myers stated that the one and one-half hour psychiatric interview revealed signs of serious mental illness.[4] Doctor Myers stated also that he believed Arpin had been suffering from a mental illness when he signed the waiver-of-rights form and confessed, and that even though Arpin may have been aware of signing the waiver form, he had not understood the implications.

In deciding defendant's motion to suppress, the trial justice considered two questions: (a) whether the *Miranda* warnings were properly given, and (b) whether Arpin knowingly, voluntarily, and intelligently waived his privilege against self-incrimination and his right to have an attorney present. The judge noted that on both these questions the obligation of the prosecutor was to establish proof beyond a reasonable

---

[3]Pursuant to G.L. 1956 (1968 Reenactment) §26-4-3(b), as amended by P.L. 1976, ch. 261, §1, Superior Court Justice Fazzano, suspecting that defendant might be incompetent to stand trial, ordered that defendant undergo psychiatric evaluation and examination. Doctor Myers conducted the examination at Justice Fazzano's request.

[4]Doctor Myers found that Arpin was suffering from delusions of satanic possession, and that Satan talked to him and caused him to think evil thoughts about women. He also indicated that he had sexual problems resulting from childhood experiences. Doctor Myers referred in his report to Arpin's feelings of persecution and depression and to his resort to drugs and alcohol for escape. Projective tests administered to defendant revealed sadistic, destructive impulses and a breakdown of emotional controls.

doubt.[5] He found that the state had sustained its burden in showing that the *Miranda* warnings were given in the proper manner and at the proper time. On the issue of waiver the trial justice distinguished *Blackburn* v. *Alabama,* 361 U.S. 199, 80 S. Ct. 274, 4 L. Ed. 2d 242 (1960), which defendant argued was controlling,[6] and found that the waiver was voluntary. Furthermore, the trial justice found that the waiver was also intelligently and knowingly made:

> "[Arpin's] account to both Captain Pare and Detective Pineau were [sic] certainly described with thought, clarity and reflection. Indeed, the defendant repeated his story as to how he was a witness to what Donald did, not once, but twice ∗ ∗ ∗ until he subsequently confessed. At this stage, I am satisfied he was alert, that he was intelligent enough to understand that the investigation could focus on him, that he came up with this story of Donald in an obvious effort to avoid being suspected himself."

In considering the testimony of Dr. Myers, the trial justice stated:

> "Doctor Myers did testify that when he, the doctor, examined this defendant, that although he declared him to be incompetent, he felt he was intelligent enough to understand and to answer the doctor's questions. The doctor further testified that it was his opinion that the defendant understood the questions in September but, possibly, because of faulty reasoning he made those statements incriminating himself."

---

[5]The trial justice at the hearing on defendant's motion to suppress inadvertently raised the state's burden of proof from "clear and convincing" to "beyond a reasonable doubt."

[6]In *Blackburn* v. *Alabama,* 361 U.S. 199, 80 S. Ct. 274, 4 L. Ed. 2d 242 (1960), the United States Supreme Court held that a confession obtained from an insane defendant and written by a deputy sheriff after a nine-hour interrogation in the absence of friends, relatives, and legal counsel was involuntary. *Id.* at 207-08; 80 S. Ct. at 280-81, 4 L. Ed. 2d at 249. The trial justice here found the factual circumstances dissimilar.

At trial, the trial justice allowed the confession to be admitted, and Capt. Pare, Det. Pineau and Dr. Myers testified before the jury concerning the events at police headquarters and defendant's demeanor at the time he signed the waiver form and gave the confession. The trial justice in his instruction to the jury referred specifically to this testimony and cautioned the jury that unless they were satisfied by proof beyond a reasonable doubt that the police had advised Arpin of his constitutional rights and that Arpin had voluntarily, knowingly, and intelligently waived those rights, they could not consider defendant's inculpatory statements.

In determining whether to permit a jury to consider inculpatory satements allegedly obtained in violation of a defendant's privilege against self-incrimination, a trial justice must comply with two procedural safeguards. *State* v. *Espinosa*, 109 R.I. 221, 283 A.2d 465 (1971). He must first conduct a preliminary hearing out of the jury's presence in which the state must show by clear and convincing evidence that the statements were obtained in a constitutional manner. Second, if the trial justice admits the evidence, he "must specifically instruct the jury that before they can consider such evidence they must first determine for themselves that the evidence in question was not obtained in violation of defendant's constitutional protections." *Id.* at 228, 283 A.2d at 468-69. In *State* v. *Leavitt*, 103 R.I. 273, 237 A.2d 309 (1968), this court suggested that while reviewing the admission of evidence allegedly obtained in violation of a defendant's constitutional rights, we should look to see whether the trial justice complied with the procedural safeguards. *See id.* at 293, 237 A.2d at 320. We find that in the present case the trial justice complied fully with the *Leavitt* and *Espinosa* safeguards.

If we find full compliance, *Leavitt* and *Espinosa* require us then to examine the record independently and in a light most favorable to the state to decide whether the trial justice's ruling was clearly erroneous. If not clearly erroneous, the trial justice's ruling disposes of the defendant's constitutional challenge. *State* v. *Leavitt, supra; State* v. *Espinosa, supra.*

After scrutinizing the record of the pretrial hearing on the motion to suppress, we find that the trial justice was not clearly wrong.

The defendant asserts that the trial justice did not adequately consider Dr. Myers' testimony, which revealed that defendant had shown a pattern of prolonged mental illness, establishing the strongest probability that defendant was insane and therefore lacked the mental capacity to waive his privilege against self-incrimination. The defendant asserts that the trial justice applied a discredited "coherency standard," *Townsend* v. *Sain*, 372 U.S. 293, 320-21, 83 S. Ct. 745, 761, 9 L. Ed. 2d 770, 790 (1963), and gave far too much credence to the statements of Captain Pare and Detective Pineau that Arpin was calm, rational, and coherent. The defendant relies principally on cases holding that an accused whose "self-preservation mechanism is negated or overridden by external force or fraud, a condition of insanity or the compulsion of drugs" cannot act voluntarily, intelligently, or knowingly. *Pea* v. *United States*, 397 F.2d 632 (D.C. Cir. 1967), *reh. en banc*, June 19, 1968; *see Eisen* v. *Picard*, 452 F.2d 860 (1st Cir. 1971); *Gladden* v. *Unsworth*, 396 F.2d 373 (9th Cir. 1968); *Reddish* v. *State*, 167 So. 2d 858 (Fla. 1964); *State* v. *Glover*, 343 So. 2d 118 (La. 1977); *State* v. *LaRosa*, 112 R.I. 571, 313 A.2d 375 (1974).

Our examination of the record reveals facts that might possibly lead a trial justice to rule that the waiver and the confession were involuntary. For example, defendant was clearly agitated at the murder scene where he was handcuffed and strapped to a stretcher. He had consumed some intoxicants earlier in the day,[7] and he had a history of mental disorders. We have taken full cognizance of these factors. From our examination of the cases cited by defendant, however, we find even these facts distinguishable from the facts that have motivated other courts to find involuntariness. In

---

[7]Arpin stated in his confession that he had drunk about a half pint of whiskey earlier in the day and that while in the van, he had smoked marijuana and consumed a powerful stimulant, the "white powder."

*Blackburn* v. *Alabama, supra,* for example, prior to the crime and the confession, the defendant had escaped from a mental institution in which he had been confined for four years to receive treatment for paranoid schizophrenia. Moreover, the custodial interrogation in *Blackburn* lasted for over nine hours, and the police practices were questionable. In *Gladden* v. *Unsworth, supra,* the defendant confessed in a drunken stupor. Witnesses testified that his pupils were dilated and that he was "jabbering," "babbling," and "raving." At the time of the confession, he could not stand and perform simple movements without extreme difficulty. In *Pea* v. *United States, supra,* the defendant had shot himself in the head, causing himself to sustain a concussion, and had not been given his *Miranda* warnings prior to interrogation in the emergency room. The court emphasized in particular the testimony of a doctor who found the defendant to be totally indifferent to protecting himself. In *Eisen* v. *Picard, supra,* the defendant did not remember committing the crime. Furthermore, he had been suffering from prolonged depression and had wandered about aimlessly in the woods for a long period after the homicides. In *Eisen* the record revealed that the trial justice gave short shrift to the insanity issue in his ruling on the motion to suppress and that his instruction to the jury on the voluntariness issue was not totally objective. *Eisen* v. *Picard,* 452 F.2d at 864. In *Reddish* v. *State, supra,* the police obtained the confessions after the defendant had shot himself in the chest and was hospitalized in critical condition. Moreover, doctors had administered to the defendant several injections of Demerol, a painkiller.

We would reiterate that in order to reverse, we must find that the ruling was clearly erroneous. *State* v. *Espinosa,* 109 R.I. at 229, 283 A.2d at 469. In *State* v. *LaRosa,* 112 R.I. 571, 313 A.2d 375 (1974), a case cited by defendant, this court applied the "clearly erroneous" standard to uphold a trial justice's ruling that a confession was involuntary. The trial justice had found, and the record persuaded us, that "during the entire interrogation defendant was crying, sobbing, and upset, and was later unable to remember what

had transpired." *Id.* at 576, 313 A.2d at 377-78. This court found the trial justice's conclusion that the defendant was so overcome by emotional stress as to make her waiver of rights and inculpatory statements involuntary was not clearly erroneous. *Id.* at 577, 313 A.2d at 378. In the instant case, however, we believe that defendant's fabricated exculpatory narration in which he claimed that a fictitious "Donald" committed the homicide, his four clear, affirmative responses to questions about understanding his rights, and his persistent willingness to waive them, all support the trial justice's ruling. Although we recognize that the line between voluntariness and involuntariness is fine, and that "the notion of 'voluntariness' is itself an amphibian," *Culombe* v. *Connecticut,*367 U.S. 568, 604-05, 81 S. Ct. 1860, 1880, 6 L. Ed. 2d 1037, 1059 (1961) (Frankfurter, J.), we cannot say that we harbor a definite and firm conviction that a mistake has been made. *United States* v. *United States Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 542, 92 L. Ed. 746, 766 (1948).

## II

On the issue of legal insanity, the trial justice instructed the members of the jury that to find Arpin not guilty by reason of insanity, they must find that at the time of the offense defendant was laboring under such a defect of reason, from a disease of the mind, as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know what he was doing was wrong. At the time of the trial the *M'Naghten* rule was the proper test in Rhode Island for the defense of lack of criminal responsibility by reason of insanity. *State* v. *Andrews*, 86 R.I. 341, 134 A.2d 425 (1957); *State* v. *Quigley*, 26 R.I. 263, 58 A. 905 (1904). Having requested instructions under the ALI test,[8] the defendant excepted to the *M'Naghten* instructions and properly preserved the issue by filing a timely appeal in February 1977.

---

[8]"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." American Law Institute, *Model Penal Code* (Final Draft) §4.01(1)(1962).

In March 1978, this court decided *State* v. *Johnson,* 119 R.I. 749, 383 A.2d 1012 (1978) (*Johnson I*), reviewing an appeal from a judgment of conviction for murder entered in 1975. In that case, the defendant, Bruce Johnson, had raised an insanity defense and had requested instructions in accordance with the ALI test. In *Johnson I* this court ordered rebriefing and reargument solely on the issue of the selection of an insanity test. 119 R.I. at 770, 383 A.2d at 1023. On February 9, 1979, after the rehearing this court abrogated the *M'Naghten* rule and formally adopted the ALI Model Penal Code Test. *State* v. *Johnston,* 121 R.I. 254, 399 A.2d 469, 476 (1979) (*Johnson II*).

At the conclusion of *Johnson II,* this court stated that the ALI test "shall apply to all trials commenced after the date of this opinion," expressing our opinion that prospective application of the rule would best serve the interests of the criminal justice system. 121 R.I. at 271, 399 A.2d at 478.

In spite of the clear language in *Johnson II,* defendant urges this court at least to give the rule of law enunciated in *Johnson II* limited retroactivity,[9] entitling this defendant to a new trial under the ALI test. In considering this issue, we feel obliged to discuss briefly the rules concerning the propriety of retroactive and prospective application of new rules of law in certain cases, and to set forth the reasoning behind our decision to apply the *Johnson II* prospectively.

It is well settled that the highest court of a state may choose to apply new rules of law in any manner it deems appropriate and just. In *Great Northern Ry. Co.* v. *Sunburst Oil & Refining Co.,* 287 U.S. 358, 53 S. Ct. 145, 77 L. Ed. 360 (1932), Mr. Justice Cardozo wrote:

> "A state in defining the limits of adherence to precedent may make a choice for itself between the principle of

---

[9]Limited retroactivity results in application of a new rule to cases still pending on direct review at the time it was announced. *See Ker* v. *State of California,* 374 U.S. 23, 83 S. Ct. 1623, 10 L. Ed. 2d 726 (1963) (applying *Mapp* v. *Ohio* exclusionary rule to case pending on direct review.)

forward operation and that of relation backward. It may say the decisions of its highest court, though later overruled, are law none the less for intermediate transactions * * *. The choice for any state may be determined by the juristic philosophy of the judges of her courts, their conceptions of law, its origin and nature." *Id.* at 364, 365, 53 S. Ct. at 148, 149, 77 L. Ed. at 366, 367.

To the same effect, the Court noted in *Linkletter* v. *Walker,* 381 U.S. 618, 85 S. Ct. 1731, 14 L. Ed. 2d 601 (1965), that new rules of criminal procedure may be applied either retroactively or prospectively, and "that the Constitution neither prohibits nor requires retrospective effect." *Id.* at 629, 85 S. Ct. at 1737, 14 L. Ed. 2d at 608.

In the past this court has chosen to apply new rules of law in the manner best suited to serve the interests of justice and to avoid hardship. *See, e.g., Digby* v. *Digby,* 120 R.I. 299, 388 A.2d 1 (1978) (new rule effective sixty days after date of opinion); *Worsley* v. *Corcelli,* 119 R.I. 260, 377 A.2d 215 (1977) (sixty days); *State* v. *Macarelli,* 118 R.I. 693, 375 A.2d 944 (1977) (statutory change applied to cases pending on direct review); *Mariorenzi* v. *Diponte,* 114 R.I. 294, 333 A.2d 127 (1975) (sixty days); *Haddad* v. *First National Stores, Inc.,* 109 R.I. 59, 280 A.2d 93 (1971) (sixty days); *State* v. *Kaufman,* 108 R.I. 728, 279 A.2d 412 (1971) (new rule of proof applied to cases not having reached final judgment).

In deciding what effect to give the rule in *Johnson II,* this court considered the factors set out in *Linkletter* v. *Walker,* 381 U.S. at 636, 85 S. Ct. at 1741, 14 L. Ed. 2d at 612: (1) the purpose of the new rule, (2) the reliance placed upon the old doctrine, and (3) the effect of retroactive application on the administration of justice. *See Desist* v. *United States,* 394 U.S. 244, 249, 89 S. Ct. 1030, 1033, 22 L. Ed. 2d 248, 255 (1969); *Stovall* v. *Denno,* 388 U.S. 293, 297, 87 S. Ct. 1967, 1970, 18 L. Ed. 2d 1199, 1203 (1967). In light of these factors we first analyzed the effect of full retroactivity of the *Johnson II* rule. As a practical matter, all defendants tried and con-

victed under the *M'Naghten* test would have been able to apply for post conviction relief and seek new trials. *See* G.L. 1956 (1969 Reenactment) §10-9.1-1 and §10-9.1-3, both enacted by P.L. 1974, ch. 220, §3. We recognized that full retroactive application would most likely have been consistent with the purpose of the new rule: to ensure that a certain class of wrongdoers deemed mentally incompetent is given psychiatric treatment in mental institutions rather than continue to be confined without treatment in correctional institutions. *United States* v. *Freeman*, 357 F.2d 606, 626 (2d Cir. 1966). At the same time, however, we felt that the reliance placed by all parties on the *M'Naghten* rule was substantial and that such reliance would have been undermined by full retroactivity. *Cf. Stovall* v. *Denno*, 388 U.S. at 300, 87 S. Ct. at 1971, 18 L. Ed. 2d at 1205 (1967) (*Wade-Gilbert* rule not applied retroactively because authorities relied on prior rule); *Johnson* v. *State of New Jersey*, 384 U.S. 719, 732, 86 S. Ct. 1772, 1780, 16 L. Ed. 2d 882, 892 (1966) (*Miranda* rule not applied retroactively because law enforcement officers had no fair notice). And most important, we concluded that full retroactivity would have placed an unacceptable burden on the administration of justice, requiring new trials on an issue that depends heavily for its proper resolution upon the testimony of lay and expert witnesses. The risk that witnesses who testified at the earlier trials would no longer be available would have been sizable; and without the necessary witnesses, there could be no guarantee that the new trials would be effective in properly determining the issue of guilt or innocence.

We therefore decided that prospective application of the *Johnson II* rule to trials commenced after the date of the decision would best serve the interests of the criminal justice system in this state. The defendant argues, however, that granting Bruce Johnson a new trial, while denying a new trial to Ronald Arpin, whose appeal might have reached this court ahead of Johnson's, is arbitrary and inequitable, and is to administer justice on the basis of a "judicial horse race."[10] In

---

[10]Arpin was represented at trial and on appeal by the Office of the Public Defender. In his brief, the public defender partially attributed the delay in defendant's appeal to an appellate backlog of over seventy cases, a backlog not faced by most private attorneys.

response to this contention, we make two points: first, prospective application of a rule, that is, announcing a rule for the future while affording its benefits to the litigants at bar is appropriate judicial procedure. *See Balts* v. *Balts,* 273 Minn. 419, 142 N.W.2d 66 (1966). It avoids the criticism that the new rule is pure dictum and provides a worthy incentive to the defendants and their counsel to advocate beneficial changes in the law. Second, in view of our strong opinion that full retroactivity of the *Johnson II* rule would have been inappropriate, we feel that drawing the line where we did was neither inequitable nor arbitrary. It is unfortunate, perhaps, that any decision to apply a new rule of law requires some linedrawing. In drawing the line, however, we attempt to reach a result that serves all parties and to avoid arbitrary distinctions based upon the stage of the appellate process at which a case happens to be at the time of the decision announcing the new rule.[11] *United States* v. *Tarrago,* 398 F.2d 621, 627 (2d. Cir. 1968) (Lumbard, C.J., concurring).

## III

In addition to requesting instructions on legal insanity under the ALI Model Penal Code, defendant also requested the judge to instruct the jury that when a defendant has adduced sufficient evidence to rebut the presumption of sanity, the sanity of the defendant at the time of the commission of the alleged crime is an element of the crime charged and must be established by the state beyond a reasonable doubt, just as it must establish every other element of the offense charged. The trial justice refused to so instruct the jury. Instead, he bifurcated his instructions on the elements of the crime of murder and on the proper test for legal insanity in Rhode Island.[12]

----

[11]"[W]hen a court is itself changing the law by an overruling decision, its determination of prospectivity or retroactivity should not depend upon the stage in the judicial process that a particular case has reached when the change is made. Too many irrelevant considerations, including the common cold, bear upon the rate of progress of a case through the judicial system." W. Schaefer, *The Control of "Sunbursts": Techniques of Prospective Overruling,* 42 N.Y.U. L. Rev. 631, 645 (1967).

[12]The bifurcation requires the jury to proceed in two separate steps: "If you find that he is not guilty beyond a reasonable doubt, that concludes your deliberations, but if you do find that he was guilty, the state has proven him guilty beyond a reasonable doubt, then you must consider whether or not he was insane on September 19, 1974."

The defendant's instructions would have required the jury, as part of their determination of guilt or innocence, to consider the same factual evidence to determine simultaneously whether Arpin was sane and whether he had the requisite criminal intent for murder at the time of the crime. To the extent that sanity and criminal intent are coextensive, then, defendant's instructions would have required the state to prove both beyond a reasonable doubt. The trial justice's instructions, however, required the state to prove all the elements of murder, including criminal intent, but required defendant to establish his insanity by a fair preponderance of the evidence. The trial justice's allocation of the burden of proof on the issue of insanity was in conformity with current Rhode Island law. *State* v. *Page,* 104 R.I. 323, 330, 244 A.2d 258, 262 (1968); *State* v. *Jefferds,* 91 R.I. 214, 218, 162 A.2d 536, 538-39 (1960); *State* v. *Harris,* 89 R.I. 202, 207, 152 A.2d 106, 109 (1959); *State* v. *Quigley,* 26 R.I. 263, 273, 58 A. 905, 910 (1904).

The defendant contends that to place the burden of persuasion of the defense of insanity on the accused in a murder trial violates the due process clause of the Fourteenth Amendment. The defendant's argument proceeds from the premise that legal insanity and the criminal intent for murder cannot coexist. Therefore, requiring a defendant to prove that he was legally insane requires him at the same time to disprove that he had criminal intent. Because criminal intent is an element of the crime charged, the proof of which must be established by the state, this procedural requirement violates due process. *See In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 1073, 25 L. Ed. 2d 368, 375 (1970). The defendant raises an important unsettled question, and we feel obliged to give it full consideration.

Jurisdictions in this country are fairly evenly split about how the burden of proof on the insanity issue should be allocated, and there is no clear modern trend. *See* Note, *Constitutional Limitations on Allocating the Burden of Proof of Insanity to the Defendant in Murder Cases,* 56 B.U.L.Rev. 499 (1976). Since 1895, the federal courts have required the

prosecution to prove sanity beyond a reasonable doubt, after the defendant has come forth with adequate evidence to rebut the generally accepted presumption of sanity. *Davis* v. *United States*, 160 U.S. 469, 16 S. Ct. 353, 40 L. Ed. 499 (1895). Although some have read *Davis* as a constitutional decision, the United States Supreme Court stated in *Leland* v. *Oregon*, 343 U.S. 790, 72 S. Ct. 1002, 96 L. Ed. 1302 (1952) that in *Davis*, the Court established no constitutional doctrine but only adopted a rule of procedure to be followed in the federal courts. *Id.* at 797-98, 72 S. Ct. at 1007, 96 L. Ed. at 1308. In *Leland*, the Court went on to say that an Oregon statute that placed on a criminal defendant the burden of proving his insanity beyond a reasonable doubt did not violate "generally accepted concepts of basic standards of justice." *Id.* 799, 72 S. Ct. at 1008, 96 L. Ed. at 1309.

Despite the Court's holding in *Leland* that a state's placing the burden of proof of the insanity issue on the defendant is not inconsistent with due process of law, its decision in *In re Winship, supra*, and *Mullaney* v. *Wilbur*, 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975) have recently cast doubt on the constitutionality of the type of state practice upheld in *Leland*. In *Winship*, the Court said, "we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. at 364, 90 S. Ct. at 1073, 25 L. Ed. 2d at 375. Although *Winship* would seem to require a state merely to carry the burden of persuasion on the factual elements of a crime, *Mullaney* v. *Wilbur, supra*, extended *Winship* by requiring the state to prove beyond a reasonable doubt even factual issues not explicitly included by the state as elements of the crime charged.

In *Mullaney*, the Supreme Court considered a Maine homicide statute that required a criminal defendant to rebut a presumption of malice aforethought and to prove as an affirmative defense that he acted in the heat of passion upon sudden provocation, in order to reduce a murder conviction to manslaughter. The effect of *Mullaney* was to cast doubt on

the constitutionality of placing the burden of proving affirmative defenses on a defendant, when proof of the defense in effect requires the accused to disprove an element of the crime. *See Mullaney* v. *Wilbur,* 421 U.S. at 702 n.31, 95 S. Ct. at 1891-92 n.31, 44 L. Ed. 2d at 522 n.31.

The constitutional question involving insanity posed by *Winship* and *Mullaney* is whether the sanity or mental capacity of a criminal defendant is so substantially interrelated with criminal intent that it becomes a part of an element of criminal conduct. The defendant contends that sanity is a precondition to criminal intent, or, put another way, that legal insanity is inconsistent with the criminal intent for murder in Rhode Island. The defendant argues that the concept of *mens rea* is based on the assumption that a person has the mental capacity to control his or her conduct in conformity with the requirements of society and to choose with a certain degree of rationality between alternative courses of action. A criminal defendant who lacks the mental capacity to control his or her conduct, defendant contends, both lacks the requisite *mens rea* for murder and is legally insane. Under the circumstances of this case, however, we disagree.

We would first note that the United States Supreme Court has clearly indicated that *Mullaney* and *Winship* do not lead ineluctably to the conclusion that *Leland* v. *Oregon, supra,* is no longer valid and that requiring a defendant to establish legal insanity violates due process.[13] Allocation of the burden of proof of insanity to a criminal defendant, therefore, is not constitutionally prohibited.

We have recently upheld a due process challenge to a procedural rule that required criminal defendants to carry the

---

[13]In *Rivera* v. *Delaware,* 429 U.S. 877, 97 S. Ct. 226, 50 L. Ed. 2d 160 (1976), the United States Supreme Court dismissed as not presenting a substantial federal question an appeal that challenged a Delaware statute that burdened a defendant with proving his affirmative defense of insanity by a preponderance of the evidence. The appellant claimed that *Leland* had been overruled by *Winship* and *Mullaney.* Subsequently, the Court stated that it was unwilling to reconsider *Leland* and *Rivera. Patterson* v. *New York,* 432 U.S. 197, 207, 97 S. Ct. 2319, 2325, 53 L. Ed. 2d 281, 290 (1977).

burden of proof of an affirmative defense other than insanity. In light of *Mullaney* and *Patterson*, we held *In re John Doe,* 120 R.I. 732, 742, 390 A.2d 920, 926 (1978), that in Rhode Island to require a criminal accused who pleads self-defense as an affirmative defense to a murder indictment to carry the burden of persuasion on that issue by a preponderance of the evidence was inconsistent with due process. 120 R.I. at 742, 390 A.2d at 926. After analyzing the murder statute, G.L. 1956 (1969 Reenactment) §11-23-1,[14] as amended by P.L. 1974, Ch. 118 §5, this court concluded that "unlawfulness, that is, the absence of self-defense," is an element of the crime, and that the defense of self-defense necessarily refutes that element of the crime of murder. *In re John Doe,* 120 R.I. at 742, 390 A.2d at 926. Although we are willing to state unequivocally that killing a person in self-defense and killing "unlawfully" are inconsistent, even mutually exclusive, we are not willing to say within the circumstances of the case before us that killing with premeditation, the requisite criminal intent for murder in Rhode Island, and killing while legally insane are inconsistent or mutually exclusive.

In Rhode Island at the time of defendant's trial, the test for legal insanity was the *M'Naghten* rule. *State* v. *Andrews,* 86 R.I. 341, 352, 134 A.2d 425, 431 (1957). Under the *M'Naghten* test, a criminal accused was deemed to be legally insane if he did not understand the nature or quality of his actions, or did not know that what he was doing was wrong. As we noted in *Johnson II, supra,* this test focuses almost exclusively on powers of cognition. 121 R.I. at 261, 399 A.2d at 473; *see United States* v. *Freeman,* 357 F.2d 606, 618 (2d Cir. 1966). We stated that "*M'Naghten* refuses to recognize volitional or emotional impairments, viewing the

---

[14]General Laws 1956 (1969 Reenactment) §11-23-1, as amended by P.L. 1974, ch. 118, §5, provides in pertinent part:

"The unlawful killing of a human being with malice aforethought is murder. [A]ny other kind of willful, deliberate, malicious and premeditated killing * * * is murder in the first degree. Any other murder is murder in the second degree."

cognitive element as the singular cause of conduct." *State* v. *Johnson*, 121 R.I. at 261, 399 A.2d at 473; *see United States* v. *Freeman*, 357 F.2d at 618. The *mens rea* element of murder, premeditation, on the other hand, clearly focuses on volition and intendment.[15] LaFave & Scott, *Criminal Law* §73 (1972). It could therefore be entirely possible for a defendant to suffer from cognitive impairments and yet to premeditate and intend the results of his actions. We have already determined above that in light of the prospective application of the rule in *Johnson II*, we are not willing to give this defendant the benefit of the newly adopted test for legal insanity. We conclude, therefore, that a careful analysis of the elements of the Rhode Island murder statute and the *M'Naghten* test for legal insanity does not support defendant's argument that legal insanity and the criminal intent for murder cannot coexist at the time of the commission of a homicide. *See* Note, *Constitutional Limitations on Allocating the Burden of Proof of Insanity to the Defendant in Murder Cases*, 56 B.U.L.Rev. 499, 512 (1976).

We are of course fully aware that we have recently abolished the *M'Naghten* rule in favor of the ALI Model Penal Code test for legal insanity. *State* v. *Johnson*, 121 R.I. 254, 399 A.2d 469 (1979). We recognize that the new test is qualitatively different in its focus and emphasis from the *M'Naghten* rule. The adoption of the new test was a policy decision made in light of considerable advances in the sciences of psychology and psychiatry, just as the original adoption of the *M'Naghten* rule was based on contemporary considerations of sound public policy. Because of our decision not to apply *Johnson II* retroactively, we have here determined the constitutional issues involved in the burden of proof of the insanity defense only under *M'Naghten*. We do not address today the question of whether the extrinsic facts

---

[15]The other components of the *mens rea* of murder, wilfulness, deliberation and malice, *see* G.L. 1956 (1969 Reenactment) §11-23-1, as amended by P.L. 1974, ch. 118, §5, also focus on volitional powers, rather than on cognitive capacity. *See* LaFave & Scott, *Criminal Law* §73 (1972).

necessary to establish the *mens rea* of premeditation and the facts necessary to prove legal insanity under our new ALI test are so interrelated, or overlap so substantially, as to present constitutional problems. Our decision today does not preclude future consideration of constitutional problems that may inhere in the Rhode Island rule that requires a criminal defendant, by a fair preponderance of the evidence, to establish legal insanity as defined by the new test.

## IV

In his request to charge, defendant asked the trial justice to instruct the jury on the statutory procedure for commitment of a defendant found not guilty by reason of insanity. The trial judge denied the request for this instruction without explanation. We take note first of defendant's admission in his brief that the requested instruction on the disposition of an accused after a verdict of not guilty by reason of insanity misstated the law at the time of the trial. In framing the requested instruction, defendant relied on G.L. 1956 (1968 Reenactment) §26-4-7.[16] Three years before the trial took place, however, the Legislature had repealed chapter 4 of title 26 in its entirety, substituting a new chapter 4 of title 26 as enacted by P.L. 1973, ch. 175, §2. Furthermore, pertinent provisions of the new chapter 4 of title 26 were later amended in 1976, before the trial. 1976 R.I. Pub. Laws, ch. 203, §2, ch. 261, §1. The defendant contends that the incorrect statement of the law was an unintentional oversight, which although erroneous, alerted the trial justice to the action he desired the court to take. The defendant further contends that the trial justice is obliged to state the law correctly and that defendant's timely exception has placed the merits-of-the-instruction issue properly before this court. *See*

---

[16]"If the jury finds the defendant not guilty on the ground of insanity and if the going at large of the person so found not guilty shall be deemed by the Court dangerous to the public peace, the Court shall certify its opinion to that effect to the governor, who, upon the receipt of such certificate may make provision for the maintenance and support of the person so found not guilty, and cause such person to be removed to the criminal insane ward during the continuance of such insanity."

*Commonwealth* v. *Mulgrew*, 475 Pa. 271, 274-75, 380 A.2d 349, 351 (1977).

We do not agree that the trial justice in this case had an obligation to instruct the jury in accordance with the proper statute. A trial justice has an obligation to give correct instructions only in regard to those rules of law that of necessity must be applied to the issues raised at trial in order to secure a fair trial. *State* v. *Butler*, 107 R.I. 489, 490, 268 A.2d 433, 434 (1970); *see* G.L. 1956 (1969 Reenactment) §8-2-38. Rhode Island law does not require a trial justice to give instructions on the procedure of committing defendants found not guilty by reason of insanity. Nor is a trial justice obliged to correct misstatements of the law in a defendant's request to charge. In *Violette* v. *Providence Ice Company*, 49 R.I. 3, 139 A. 500 (1927), the plaintiff had excepted to the refusal of the trial justice to give certain instructions and to modify other instructions found to be inadequate. The court there stated that "when a request to charge is denied as incorrect the court is not bound to make and give a modification of the charge requested." *Id.* at 5, 139 A. at 501.

We believe that denial of defendant's request to charge would have been proper either because it was a misstatement of the law or because no such instruction is required under Rhode Island law. The trial justice had no obligation to modify the charge to reflect the repeal of the old statute, the enactment of the new statute, or its subsequent amendments. *Violette* v. *Providence Ice Co.*, *supra.*

V

The defendant finally contends that the trial justice erred in not qualifying as an expert Dr. Jeffrey Klugman, a medical doctor with some specialized training in psychiatry, who had examined Arpin from May to June 1974 during treatment at the Veterans Administration Hospital in West Haven, Connecticut.

Our examination of the record reveals that Dr. Klugman received his medical degree from the University of Pennsylvania in May 1973 and was a qualified Doctor of Medicine when he examined Arpin and when he testified at trial. After beginning his residency in psychiatry at the Yale Medical School in July 1973, Dr. Klugman was assigned to the Veterans Administration Hospital, where, with a limited license to practice, he diagnosed and treated for various psychological disorders a number of patients, including Ronald Arpin. In July 1974, shortly after he treated Arpin, he received a general license to practice in Connecticut. At the time of the trial in November 1976, Dr. Klugman had completed his residency and received a certificate in psychiatry. He had set up a private practice and was a teaching member of the Yale faculty. Although not yet "certified" by the American Board of Psychiatry and Neurology, he was at that time "Board eligible," waiting a prescribed period of time before taking the Board's examinations.

The trial justice ruled that Dr. Klugman was not qualified as an expert to testify to his observations of Arpin at the hospital or to offer a diagnosis based on those observations. The defendant states in his brief that Dr. Klugman would have been asked no hypothetical questions, nor would he have been asked to offer an opinion on the ultimate legal issue of defendant's sanity *vel non* at the time of the homicide. We shall assume this to be true for the purposes of our review. The limited issue therefore is whether the trial justice erred in refusing to allow Dr. Klugman to testify to his observations and to offer his diagnosis.

"Whether a witness is qualified to express an expert opinion is a matter which is addressed to the sound discretion of the trial justice, and the exercise of such discretion will not be disturbed by this court on appeal absent a showing of abuse." *Schenck* v. *Roger Williams General Hospital,* 119 R.I. 510, 520, 382 A.2d 514, 519 (1977); *see State* v. *Robertson,* 108 R.I.

656, 662, 278 A.2d 842, 846 (1971). In the circumstances of this case we must hold that the trial justice abused his discretion in refusing to permit Dr. Klugman to testify. Although the record indicates some focus on Dr. Klugman's qualifications and experience at the time he examined Arpin in 1974, the trial justice should determine the competency of a witness to testify as an expert based on his qualifications *at the time of the trial. Id.* at 664, 278 A.2d at 847. We believe that Dr. Klugman was properly qualified at least to relate his personal observations and then to make a diagnosis based on those observations. *Cf. Schenck* v. *Roger Williams General Hospital,* 119 R.I. 510, 382 A.2d 514 (1977) (in malpractice suit, cardiologist held competent to testify to patient's psychiatric condition as it related to issue of causation); *Lantini* v. *Daniels,* 104 R.I. 572, 247 A.2d 298 (1968) (city physician held competent to testify on question of police officer's mental condition and ability to return to work).[17]

We find, however, that the refusal of the trial justice does not require reversal. After the trial justice made it clear that he would not qualify Dr. Klugman to testify as an expert, defendant's counsel introduced as an offer of proof a summary of defendant's psychiatric condition prepared by Dr. Klugman. The trial justice denied the offer of proof. In a similar context, in order to determine whether a trial justice's

---

[17]We do not decide here whether Dr. Klugman was qualified to answer hypothetical questions or to offer an opinion on the defendant's sanity *vel non* at the time of the homicide. In criminal cases, when the issue on which a putative expert will be asked to offer an opinion is lack of criminal responsibility due to mental illness, the rule of two civil cases, *Schenck* v. *Roger Williams General Hospital,* 119 R.I. 510, 382 A.2d 514 (1977) and *Lantini* v. *Daniels,* 104 R.I. 572, 247 A.2d 298 (1968), that medical doctors are competent to testify on matters of mental condition or insanity, does not control. The trial justice has discretion in a criminal trial to require even medical doctors to demonstrate that they have some specialized training and practical experience in the field of psychiatric disorders. *See Commonwealth* v. *Boyd,* 367 Mass. 169, 182, 326 N.E.2d 320, 329 (1975). As in a similar case in which the issue was the qualifications of a clinical psychologist, we do not attempt here to delineate precise guidelines for determining what amount of specialized training and experience in the field of mental disease will qualify a medical doctor to express an opinion on the ultimate fact of a defendant's sanity. *See State* v. *Robertson,* 108 R.I. 656, 662, 278 A.2d 842, 846 (1971).

decision to exclude expert testimony constituted reversible error, this court stated that:

> "[w]e must, for the purposes of this appeal, examine the case in light of the offer of proof in order to determine if the rejected evidence reasonably could have altered the result. The purpose of the offer of proof is to enable the court to determine the materiality, relevance, and competence of the evidence that was excluded upon presentation so that we may determine whether defendant was prejudiced by the exclusion." *State* v. *Almeida*, 111 R.I. 566, 570, 304 A.2d 895, 898 (1973).

The defendant argues that because Dr. Klugman was the only witness who examined Arpin prior to the homicide, his testimony would have been especially relevant and critical to the defense. We do not feel in this case that the timing of the examination is dispositive. The offer of proof shows the Dr. Klugman would have testified to Arpin's alleged paranoid schizophrenia, his history of depression, crime, and sexual disorders, and his satanic delusions. Our examination of the record reveals that the testimony of Dr. Herbert Myers, Dr. Manuel Soria, and Mr. John Racofsky clearly presented comparable medical and diagnostic information to the jury.[18] We conclude, therefore, that Dr. Klugman's testimony would have shed no new light on defendant's mental condition before the homicide, and its admission could not be said to have reasonably altered the result reached by the jury. *State* v. *Almeida, supra.*

The defendant's exceptions are overruled, the appeal is denied and dismissed, and the judgment appealed from is affirmed.

[18]Doctor Manuel Soria, the clinical director of the forensic unit at the Rhode Island Medical Center, examined and observed Arpin during the time he was incompetent to stand trial, February 1975 to June 1976. John Racofsky, a clinical psychologist affiliated with the Rhode Island Institute of Mental Health, administered a battery of diagnostic and projective tests to Arpin on December 10, 1974, as preparation for Dr. Myers' psychiatric interview on December 16, 1974, in which Arpin was determined to be incompetent to stand trial. The testimony of Dr. Soria and Mr. Racofsky supported the diagnosis of Dr. Myers that Arpin suffered from paranoid schizophrenia.

*Dennis J. Roberts II*, Attorney General, *Alan R. Tate*, Special Assistant Attorney General, for plaintiff.

*William F. Reilly*, Public Defender, *Barbara Hurst*, Chief Appellate Attorney, *John A. MacFadyen III*, *Lise J. Gescheidt*, Assistant Public Defenders, for defendant.