**CITY OF EAST PROVIDENCE**

v.

**Douglas E. McLAUGHLIN.**

**No. 90–416–M.P.**

Supreme Court of Rhode Island.

July 1, 1991.

James M. Russo, Asst. Sol., City of East Providence, East Providence, for petitioner.

Thomas J. McAndrew, Patricia E. Andrews, Providence, for respondent.

## OPINION

MURRAY, Justice.

This case comes before us on a petition for certiorari by the city of East Providence. The city seeks review of the final decision of a hearing committee (committee) convened pursuant to the Law Enforcement Officers' Bill of Rights, G.L.1956 (1988 Reenactment) chapter 28.6 of title 42. The committee had ruled in favor of the respondent, Captain Douglas E. McLaughlin (McLaughlin) of the East Providence police department, finding him not guilty of the charge of conduct unbecoming an officer. For the reasons that follow, we affirm the committee's decision in part and reverse in part.

McLaughlin is a veteran of over twenty years' service with the city's police department. The investigation into McLaughlin's alleged misconduct began in March of 1989 when the East Providence Minority Political Caucus informed the city council of alleged racial remarks made by McLaughlin and requested that the city council investigate the matter. Onna A. Williams, affirmative-action officer for the city, conducted a preliminary investigation into the allegations. On September 5, 1989, she filed a report with the city manager, Paul E. Lemont, in which she stated that "the evidence shows an overwhelming preponderance of offensive behavior that is continuous and flourishing." Williams concluded that McLaughlin had displayed conduct unbecoming an officer on numerous occasions and had discredited himself and the entire police department; she recommended that McLaughlin be terminated, and Raymond G. Benoit, the city's personnel director, concurred.

Williams then submitted a formal complaint to the city's police department, citing the numerous occurrences set forth in her report. Consequently, acting chief of police Captain Carl A. Winquist commenced an internal investigation in accordance with § 42-28.6-2. On November 20, 1989, Winquist submitted his report in which he discussed four of the specific incidents cited by Williams and recommended dismissal for conduct unbecoming an officer. Conduct unbecoming an officer is defined in paragraph G of the East Providence Police Department Rules and Regulations as "that which brings the Department into disrepute or reflects discredit upon the officer as a member of the Department, or that which impairs the operation or efficiency of the Department or officer."

On December 28, 1989, after reviewing all the evidence, city manager Lemont advised McLaughlin that effective January 2, 1990, he would be reduced in rank to patrol officer and suspended without pay for six months. Lemont also informed McLaughlin that he was entitled to a hearing on the issues by a hearing committee before the disciplinary action was invoked. *See* § 42-28.6-4. Thereafter McLaughlin exercised his right to a hearing, and Lemont's decision was stayed pending the outcome.

The committee, consisting of Captain J. Peter Plenninger of the Westerly police department, Captain Dennis McCarthy of

the East Providence police department, and Lieutenant Elwood M. Johnson of the Rhode Island State Police, conducted its hearing over nineteen dates beginning on February 7, 1990, and ending on June 26, 1990, and heard testimony from almost thirty witnesses. On August 9, 1990, it announced its decision. The committee addressed the four allegations separately, refusing to recognize a longstanding pattern of racial and sexual discrimination as alleged by the city. After determining that none of the four incidents rose to the level of a violation, the committee concluded that McLaughlin was not guilty of conduct unbecoming an officer. The committee also found that the city had failed to conduct an appropriate investigation prior to Winquist's involvement.

Section 42–28.6–12 of the Law Enforcement Officers' Bill of Rights provides in pertinent part:

> "[T]he city or town may seek review of the final decision of the hearing committee by writ of certiorari to the supreme court on the grounds that the decision was arbitrary or capricious or characterized by abuse of discretion or affected by error of law."

On October 4, 1990, this court granted the city's petition for writ of certiorari.

■ The Law Enforcement Officers' Bill of Rights, enacted in 1976, is the exclusive remedy for permanently appointed law-enforcement officers who are under investigation by a law-enforcement agency for any reason that could lead to disciplinary action, demotion, or dismissal. *Lynch v. King*, 120 R.I. 868, 870 n.1, 391 A.2d 117, 119 n.1 (1978). Endowed with broad powers of investigation by the General Assembly, the committee is not bound by the recommendations of the charging authority but may call witnesses, make findings of fact, and sustain, modify, or reverse the charges of the investigating authority. *Id.* at 878, 391 A.2d at 123. In our review of the committee's findings, we shall neither weigh the evidence nor make findings of fact; instead, we shall examine the extensive record to determine whether some competent evidence exists to support the committee's decision. *Lantini v. Daniels*, 104 R.I. 572, 574, 247 A.2d 298, 299 (1968); *Hooper v. Goldstein*, 104 R.I. 32, 43, 241 A.2d 809, 814–15 (1968).

■ The committee made specific findings on the four allegations of misconduct addressed in Winquist's report. Although the briefs of both parties discuss additional matters, we shall limit our review to those four areas. The committee also applied the charge of conduct unbecoming an officer to each incident independently, refusing to recognize an alleged longstanding pattern of racial and sexual discrimination. The city argues that in so doing, the committee abused its discretion and acted arbitrarily and capriciously. We disagree. The committee was convened to review the disciplinary action imposed following Winquist's official investigation. In his report Winquist dealt with the four incidents separately and did not discuss a pattern of discrimination. Because this official report led to McLaughlin's demotion and suspension, the committee was entitled to review only the official findings and to refuse to find a pattern of discrimination. Furthermore it is unlikely that the committee would have found a pattern of discrimination after concluding that none of the incidents supported the charge independently.

The four allegations addressed by the committee include: (1) McLaughlin's use of racial slurs at a 1982 Emerald Society Meeting; (2) McLaughlin's requiring a black patrol officer to raise his right hand when swearing to the truth of drunk-driving-arrest reports; (3) McLaughlin's use of a racial slur during a taped undercover investigation; and (4) McLaughlin's racial and sexual discrimination against a black patrol woman. We shall discuss each of these in turn.

I

■ In September or October of 1982 several members of the East Providence police department met to organize a local chapter of the Emerald Society, a private organization open to law-enforcement officers of Irish decent or with spouses of Irish descent. An abbreviated tape recording of

that meeting was played at the hearing. On the tape McLaughlin was heard to inquire whether "niggers" would be permitted to join. After allowing in the tape and its corresponding transcript as full exhibits, the committee rejected them as having no probative value.

Section 42–28.6–6 of the Law Enforcement Officers' Bill of Rights provides:

"Evidence at hearing.—Evidence which possesses probative value commonly accepted by reasonable and prudent men in the conduct of their affairs shall be admissible and shall be given probative effect. The hearing committee * * * may exclude incompetent * * * evidence."

The committee made it clear that it would accept any and all items of evidence when proffered and determine their probative value afterward. Therefore, the committee was not obliged to rely on the tape after allowing it in as evidence if the committee found the tape's credibility suspect.

Our review of the record reveals that the entire two-hour meeting had been taped in order to facilitate transcription of the minutes. That tape was stolen from a police officer's desk a few days later along with several tape recordings of Irish music. In 1989, after a seven-year absence, a severely edited version of the tape was anonymously sent to the home of Detective Ralph W. Ezovski. It contained only a five-minute portion of the original tape. Several witnesses testified that it was not a true and accurate recording of the meeting. Heard out of context and containing many inaudible and unidentifiable voices, the tape recording was properly found not probative.

Although the committee disregarded the tape, other witnesses testified to the incident and McLaughlin admitted making the remarks. McLaughlin testified, however, that he had been verbally disciplined shortly after the incident by then-city manager Earl Sandquist and then-city solicitor Orlando Andreoni. Raymond Benoit, personnel director for the city at that time, confirmed that he had been present at that meeting, although he had left early.

The city claims that the committee abused its discretion in finding that McLaughlin had been reprimanded because Winquist had reported that three of the men allegedly present at the meeting did not remember it. Thus the city urges us to believe that a hearsay statement regarding lack of recollection proves that the meeting never occurred, even in the face of direct testimony to the contrary. Because the committee had the opportunity to observe the witnesses before them, which we have not, we cannot say that the committee abused its discretion. Furthermore, we agree with the committee that the proper time to have prosecuted McLaughlin for this incident was 1982, not now.

Accordingly we conclude that the committee did not err in finding McLaughlin not guilty of the charge regarding this incident.

## II

■ Officer Frederick W. George, a black male, testified that McLaughlin discriminated against him in 1983 when then-Lieutenant McLaughlin required George to raise his right hand when he swore to the truth of his drunk-driving-arrest reports. George had concluded from conversations with some of his fellow white officers that they were not so required when bringing their reports before McLaughlin. McLaughlin testified that he had not required George to raise his hand but that George had automatically done so because of his extremely professional manner.

We note that George's hand raising occurred only for the first four or five arrest reports to which he swore during his probationary period. It is possible, therefore, that this well-disciplined officer raised his hand of his own accord and ceased to do so when he became more comfortable with the procedure. Although George could cite no other incidents when he felt that McLaughlin had treated him differently from anyone else, he admitted basing his feelings of discrimination partly on conversations with other officers about their problems with McLaughlin. In fact George testified that he had not felt that he was being treated

differently or discriminated against at the time he was raising his hand.

The committee concluded that the testimony did not support a charge of racial discrimination, and after reviewing the evidence, we find that there is support for this conclusion.

### III

██ On July 15, 1988, McLaughlin participated in an undercover operation in Providence with two other detectives in which they posed as prospective buyers of stolen construction equipment. McLaughlin arranged to tape record the meeting in order to have an accurate record of the transaction. Prior to the meeting the suspect had suggested doing business in South Providence, but McLaughlin knew that the "sting" had to take place in his own jurisdiction. Emphasizing his unwillingness to do business in South Providence, McLaughlin used a racial slur to describe the black residents there. The suspect was convinced, the deal was made in East Providence, and the operation resulted in successful convictions and in commendations for all the officers involved.

The city argued that McLaughlin's use of the epithet could have been detrimental to the case if the tape had been played before a racially mixed jury. As it happened, there was no need for a jury trial. Furthermore the committee found that McLaughlin had conducted himself professionally during an operation that required improvisational role playing. In order to gain the suspect's confidence, McLaughlin had used language that would have been improper in his everyday conduct as a police officer. The epithet at issue was adrift on a sea of expletives that would have offended people of normal sensibilities and would not have been tolerated if used by police officers in their everyday interactions with the public.

In this situation McLaughlin was portraying himself as anything but a police officer, and his language was adapted for that purpose. Because the operation was a success, it is inappropriate to speculate how McLaughlin's language might have af-

fected the case had it gone before a jury. Accordingly we find that the committee did not err in finding McLaughlin not guilty of the charge relating to this incident.

### IV

██ On November 27, 1988, Officer Cathy Tabela–Sailor, a black female, sought a leave of absence for personal reasons. In a memo to Colonel Anthony DeCastro, McLaughlin recommended that her request be denied if the personal reasons involved other employment. Tabela–Sailor alleged that this was racial and sexual discrimination because one year earlier Detective Robert Pacheco, a white male, had sought a leave of absence for the same reasons and McLaughlin had not recommended that his request be denied.

The committee found that at the time of Tabela–Sailor's request McLaughlin was her division commander whereas he had been only a detective lieutenant at the time of Pacheco's request. Therefore, McLaughlin had an obligation to advise DeCastro of what he knew personally regarding Tabela–Sailor's request, an obligation that he had not had the previous year. In support of this explanation the committee found that Lieutenant Francis Ferguson, Tabela–Sailor's immediate superior, had made no recommendation when he forwarded Tabela–Sailor's request to McLaughlin. We see no error in these conclusions.

Tabela–Sailor also alleged that McLaughlin had used racist and sexist slurs to describe her when speaking to others. The committee found that these alleged epithets, if they were to be believed, were not personally directed at anyone. Therefore, the committee found that McLaughlin was not guilty of the charge as it pertained to these incidents.

Upon reviewing the evidence, we see no reason to conclude that the committee abused its discretion in deciding these issues.

### V

██ Finally, we note the committee's conclusion that the city failed to handle the

matter as prescribed by the Law Enforcement Officers' Bill of Rights. Specifically, the committee stated that "the matter should have been investigated in-house by a member of the East Providence Police Department and from day one, the accused, Capt. Douglas E. McLaughlin, should have been advised that he was under investigation."

We find, as the committee did, that the matter was handled appropriately from the time of Winquist's investigation. Prior to that time Onna Williams' investigation was conducted merely to explore the need for an official investigation. As a preliminary proceeding not resulting directly in disciplinary action, Williams' investigation did not have to meet the requirements of the Law Enforcement Officers' Bill of Rights. Rather her investigation laid the groundwork for her swearing out a formal complaint, which led to the official investigation. Therefore, we find that the city did not violate the statutory guidelines prior to Winquist's official involvement. The committee erred in concluding otherwise.

Although we commend the city's efforts to rid its police department of racist and sexist attitudes in order to foster better relations within the department and between the department and the community, we find sufficient evidence to support the committee's ruling in favor of McLaughlin. Therefore, with the exception of the committee's finding on the city's investigation of the matter, we conclude that the committee did not abuse its discretion and its findings were not arbitrary or capricious.

For the foregoing reasons the city's petition for certiorari is granted, and the decision of the hearing committee is affirmed in part and vacated in part.