DECISION
Before this Court[1] for decision is an appeal by Tonya Harris ("Harris" or "Plaintiff") of a decision rendered by a hearing board ("Board") formed pursuant to the Law Enforcement Officers' Bill of Rights Act ("LEOBR" or "LEOBR Act"). The board terminated Harris from her position with the Providence Police Department ("PPD," "City," or "Defendant"). Harris now moves this Court to vacate the Board's decision; the PPD maintains that the decision should be upheld. Jurisdiction is pursuant to G.L. 1956 §§ 42-28.6-12 and 42-35-15.
 FACTS AND TRAVEL
On May 27, 2004, Colonel Dean Esserman, Chief of the PPD ("Esserman"), issued a departmental complaint ("complaint") against Harris alleging that she had violated nine PPD rules and regulations. He recommended that she be terminated. Harris was charged with having violated her duty to report information, failing to be truthful, committing conduct unbecoming an officer and conduct tending to cast disrepute on the department, neglecting her duty, committing malfeasance, acting contrary to good order and discipline, failing to comply with state law, and soliciting influence. (See generally May 27, 2004 Complaint and Notice.) Of significance is the fact that, as to all relevant charges, Chief Esserman alleged Plaintiff's misconduct related to her receipt of promotion test information from former PPD Chief Urbano Prignano ("Prignano").
The complaint alleged that Harris had received advance information pertaining to a 1996 PPD sergeant's promotional examination ("sergeant's examination"). Pursuant to a collective bargaining agreement between the City of Providence and the police officers' union, the Fraternal Order of Police ("FOP"), the promotional process included objective written examinations after which the officers with the highest ten scores received the sought-after promotion. On June 11, 1996, Harris applied for a promotion to the rank of sergeant. See id. at 3. It would later come to light that a wide-reaching scandal was brewing within the PPD at that time. A federal investigation would subsequently reveal that corruption plagued city government, including the department's promotional process.[2]
In the course of conducting its investigation into city corruption, the Federal Bureau of Investigation ("FBI") interviewed Prignano on numerous occasions. It was in the course of those interviews that Prignano initially implicated Harris by describing his purported interaction with her prior to the 1996 sergeant's examination. These particular statements, detailed below, would later form the principal basis for the Board's decision on appeal before this Court.
During an October 31, 2000 interview with the FBI, which was memorialized in an FBI 302,[3] Prignano explained that the PPD typically received prior to each testing date a "source sheet" from the test manufacturer that "identifie[d] the specific source of each question on the exam and [was] utilized to review each question on the exam to ensure that each question came from the study material." (Oct. 31, 2000 FBI 302 at 8.) Prignano noted that the "source sheet [was] so specific, that if any candidate had the source sheet prior to the promotional exam, that candidate would have a significant advantage over other candidates." Id.
Prignano revealed to the FBI that he gave Harris a copy of the source sheet in advance of the 1996 sergeant's exam. Id.
Prignano told the FBI that he "met with [Harris] in his office and gave her a copy of the source sheet."[4] He did so at the suggestion of then-police officers — and FOP representatives — Michael Marcoccio ("Marcoccio") and Robert Quinn ("Quinn").Id. According to Prignano's 302, he met with Marcoccio, Quinn, and Donna Searles of the Human Resources Department ("Searles") to review the examination questions. Id. According to Prignano, Marcoccio and Quinn expressed their concern that Harris would allege racial discrimination unless she received the promotion.[5] Concerned that such allegations would "make the Police Department look bad," Prignano agreed to give Harris the source key materials. Id. at 8-9. In another interview by the FBI three months later, Prignano reiterated that he had given the Plaintiff the answer key. (Jan. 24, 2001 FBI 302 at 1.)
Prignano testified to similar facts in the United States District Court for the District of Rhode Island during a criminal trial which emanated from the Plunder Dome investigation.[6] The following exchange took place between Prignano and Assistant United States Attorney Richard Rose ("Rose"):
 "Question: Have you ever given anyone the source [sheet] prior to any written examination for promotion in the Providence Police Department while you were the Chief?
 Answer: Yes.
 . . . .
 Question: [W]ho did you give it to?
 Answer: Tonya [Harris].
 Question: Now explain the circumstances of you giving it to her.
 Answer: Patrolman [Robert] Quinn and Patrolman [Michael] Marcoccio, who is the head of the union, came to see me one morning, and they said they . . . wanted to help Tonya King because of the last examination she took. She scored on it, and they had cut her off the exam. She was demoted from one of the top ten.
 . . . .
 Question: And based on that . . . you gave her the answers?
 Answer: I gave her the — it's not really the — it's where the answers would be, and she [c]ould read it and find the answer on a certain page." (May 13, 2002 Trial
Testimony Tr. at 144-46.)
Prignano was not cross-examined concerning these assertions.See May 13, 2002 Trial Test. Tr. at LEOBR Hr'g City Ex. 6.
Prignano's testimony, obviously hearsay in this LEOBR proceeding, was replicated in other reports authored by the FBI. Then Major Martin Hames ("Hames"), as reported in a FBI 302, indicated that he had discussed with Prignano the fact that Prignano had given Harris the source material just prior to the 1996 examination. (Nov. 7, 2000 FBI 302 at 1.) Moreover, then Captain John Ryan ("Ryan"), in deposition testimony unrelated to this action, testified that he was familiar with Prignano's testimony regarding his having given the source key to Harris. (July 21, 2003 Depo. Tr. at 66, Young v. City of Providence,301 F. Supp. 2d, 187 (2004).) Ryan testified that Prignano had "mentioned" to him that "in fact he had provided [the source sheet] to Tonya King." Id. at 169. Prignano had told Ryan that giving Harris the test was a "practical solution" to curbing her growing anger at the department. Id. at 171. Finally, in the same deposition, Ryan testified that "[he] believe[d] [Prignano] was speaking truthfully when he said that he gave [the source sheet] to [Harris] for the sergeant's exam." Id. at 189-90. These assertions by Ryan were diametrically opposite to his representations to the Police Commissioner. See infra, at 11.
Harris herself testified on three occasions that she, in fact, never received the source key materials from Prignano, or anyone else, prior to the 1996 sergeant's examination. On November 2, 2000, before a federal grand jury convened as part of the larger investigation into alleged city corruption, Harris testified that Prignano's allegations were simply false; she never obtained a copy of the source sheet — or any other material — prior to sitting for the Sergeant's exam. (See Nov. 2, 2002 Federal Grand Jury Hr'g Tr. at 8.) The Plaintiff testified similarly before a Rhode Island Grand Jury on July 17, 2002, as follows:
 "Q. Prior to taking the July 1996 exam, did anyone do anything, to your knowledge, to assist you with the examination?
 A. No.
 Q. Did anyone give you any documents?
 A. No.
 Q. Either directly or indirectly which would have assisted you on that test?
 A. No." (July 17, 2002 Rhode Island Grand Jury Hr'g Tr. at 34-35.)
At a Garrity Hearing[7] on that same day, Harris reiterated that she never received the source materials from Prignano. (See July 17, 2002 Garrity Hr'g Tr. at 9.) In each of these proceedings, Harris was insistent that she received no outside assistance in preparing for the 1996 exam. Rather, she "took a three-week vacation and studied" on her own. Id. at 7.
Despite the conflicting testimony regarding the circumstances leading up to the sergeant's examination, the results of that test are undisputed. Harris scored a 93 out of a possible 100 points, placing her second among her colleagues and, therefore, making her eligible for the promotion which she later received. (Jan. 31, 2005 Hr'g Tr. at 22; Feb. 11, 2005 Hr'g Tr. at 107.) Officer Michael Harris, a good friend of the Plaintiff who would later become the Plaintiff's husband, also sat for the exam. He also scored a 93. (Jan. 31, 2005 Hr'g Tr. at 22.) The Plaintiff and Michael Harris got the same seven questions wrong, choosing the same incorrect answer on five of those seven questions. Id.
These test results, combined with the statements later made by Prignano and Ryan, prompted the investigation which led to Chief Esserman's complaint.
Pursuant to G.L. 1956 § 42-28.6-4, any law enforcement officer who is the subject of a law enforcement agency investigation or interrogation which "results in the recommendation of some action . . . which would be considered a punitive measure" must receive notice that he or she is entitled to a hearing on the issues before a hearing committee. Sec. 42-28.6-4(a). The statute further mandates that the law enforcement officer facing the potential punishment must file a written request for a hearing within five days of receiving notice of said charges. Section42-28.6-4(c). As noted above, in May 2004 Harris was issued a complaint citing nine violations of PPD rules and regulations relative to her receiving a copy of the source sheet from Prignano prior to taking the sergeant's examination. Harris filed a timely appeal for a LEOBR hearing.
On January 25, 2005, the Board first convened to address certain preliminary matters, most notably the Plaintiff's request to dismiss charges one and nine for being outside the three-year statute of limitations as specified in § 42-28.6-4.[8]
Because the Board was not certain whether it had the authority to dismiss any of the charges without hearing evidence on the merits, it held that it was "duty bound" to hear the case in its entirety. (March 10, 2005 Decision at 4.) The hearings consisted of eleven days of testimony from eighteen witnesses and included the submission of 83 exhibits. Id. at 5.
Because the investigation into Harris' alleged impropriety was largely the result of statements made by Prignano, and purportedly corroborated by Ryan, it was important that these two individuals be called to testify before the Board. Ryan was called. However, he invoked his Fifth Amendment privilege against self-incrimination in response to every question posed to him on direct examination and on cross-examination. See generally
Jan. 31 Hr'g Tr. at 119-138. Counsel for the City indicated that Prignano would follow the same course should he be called to testify. Accordingly, the parties agreed not to call him.
Once it became evident that both Prignano and Ryan would both be "unavailable" to testify,[9] the Plaintiff argued that the Board must be precluded from considering the prior statements made by Prignano and Ryan — specifically Prignano's FBI 302 and trial testimony along with Ryan's deposition testimony fromYoung. (Feb. 1, 2005 Hr'g Tr. at 104-07.) Harris stressed, and the City agreed, that these statements were clearly hearsay, as they were statements "offered in evidence to prove the truth of the matter asserted," particularly, that Prignano physically gave the source sheet to Harris. See R.I.R. Evid., 801 (defining hearsay). The Plaintiff further claimed that these hearsay statements did not fit into any of the prescribed exceptions, and, as such, the Board could not admit them into evidence. Harris argued that because these witnesses were "unavailable" by virtue of having invoked their Fifth Amendment privileges, their former testimony could then only be admitted into evidence in the event that "the party against whom the testimony is now offered, or . . . a party with similar motive and interest had an opportunity to develop the testimony by direct, cross or redirect examination." R.I.R. Evid., 804(b) (1); see also Feb. 1, 2005 Hr'g Tr. at 105-06.
The Plaintiff's position relative to the alleged unfairness in considering this former testimony was summarized for the Board as follows:
 "[N]ot only was Tonya Harris not present at any of the testimony or any of the grand juries, not only was her attorney not present, not only did she not have the opportunity to question any of these things, not only did she have no previous opportunity to cross-examine these people on the subject matter, which is the subject of the case, but the statements that these people made in these proceedings were not substantially pursued by Richard Rose. . . . So we object to having [t]his testimony just admitted as face value because we get absolutely no opportunity to cross examine." (Feb. 1, 2005 Hr'g Tr. at 106-07.)
The City, on the other hand, maintained that "unlike a civil proceeding and unlike a criminal proceeding, a Law Enforcement Officers' Bill of Rights Hearing Committee is an administrative agency." Id. at 112-13. As such, the City averred that "given the nature of the proceeding . . . that transcript comes in, as does all records, all documents, only subject to rules of privilege and . . . a determination of relevancy left to the sound discretion of the hearing committee." Id. at 114.
After much deliberation, the Board decided that it would admit the former testimony by Prignano and Ryan into evidence. (Feb. 2, 2005 Hr'g Tr. at 156.) The Board members stressed that they were "capable of deciding how credible or lack of credible [sic] or how good or not good the information was amongst [them]selves and give it whatever appropriate weight [they] thought it had or didn't have." Id.
In addition to the evidentiary issue concerning the statements made by Prignano and Ryan, the Board considered the testimony of a number of other witnesses. The City first called Searles, who worked in the Human Resources Department of the PPD in 1996. She testified that the source sheet had been faxed to her from the testing manufacturer at some point prior to the testing date. (Jan. 31, 2005 Hr'g Tr. at 36-38, 50.) Prior to the 1996 sergeant's examination, Searles testified, Prignano had asked her to help Harris study, which she accomplished by handing Harris a text book in which "a lot of things [she] had highlighted in regards to the exam." Id. at 45-46. Searles also noted that she brought a copy of the source sheet to Prignano in his office at his request, and he "put it in his right bottom drawer." Id. at 51, 116, 119.
The City also called Sergeant Patrick McNulty ("McNulty"), the lead detective for the PPD working on Harris' case. (Feb. 2, 2005 Hr'g Tr. at 5.) On cross-examination, McNulty admitted that Prignano had a propensity to lie even in connection with police matters and that "[h]e could stretch the truth." Id. at 46. Similarly, McNulty acknowledged that Ryan too had contradicted himself in the past while under oath. Id. at 128-29.
Esserman was called by the City to establish the seriousness of the offenses alleged against Harris. He testified that he recommended the Plaintiff be dismissed from the PPD because violating the law enforcement officers' oath — as he had determined Harris to have done — strips one of the "ability to function and to carry out one's job as a law enforcement official." (Feb. 7, 2005 Hr'g Tr. at 18.) Moreover, he stated that the Plaintiff's termination was necessary to protect the fairness of the promotional process and the honor and integrity of the PPD. Id. at 19-20.
The PPD also called two former police officers and FOP representatives, Robert Quinn ("Quinn") and Michael Marcoccio ("Marcoccio"), who allegedly met with Prignano in the days preceding the sergeant's examination. Through its questioning of these witnesses, the City attempted to clarify for the Board a promotional process that was the result of a carefully crafted collective bargaining agreement between the City and the FOP. (Jan. 31, 2005, Hr'g Tr. at 138-43.) Quinn and Marcoccio also both testified regarding Harris' 1994 test results, and her subsequent anger at being bumped from the top ten. (Id. at 143-51; Feb. 1, 2005 Hr'g Tr. at 44-48.) Both witnesses testified regarding a meeting with Prignano and Searles just prior to the 1996 sergeant's exam to which Searles brought a copy of the source sheet.[10] Neither witness, however, recalled suggesting to Prignano at that meeting that he give a copy of the source sheet to Harris, contrary to Prignano's previous testimony to that effect. (Feb. 1, 2005 Hr'g Tr. at 13, 54.)
Finally, the PPD presented the testimony of Dr. William Fairley ("Fairley"), an expert statistician. Fairley examined the testing materials and results and calculated that the odds of Tonya Harris and Michael Harris receiving the same score, with the same seven answers wrong — each marked with the same incorrect answer five out of seven times — amounted to roughly fourteen per 100,000 occurrences, or .01%. (Feb. 4, 2005 Hr'g Tr. at 21.) Fairley concluded that the scores received by the Plaintiff and her husband on the 1996 exam were the result of "joint advance information" rather than mere coincidence. Id. at 99-100.
Following the presentment of the City's case, Harris called two experts. Dr. Alan Olinsky ("Olinsky"), a professor of mathematics and statistics at Bryant University, testified that the results of the test revealed only the possibility of "side by side" cheating, but not any other aspect of cheating, such as "having the answer key or predetermined . . . information." (Feb. 9, 2005 Hr'g Tr. at 25-26.) In fact, Olinsky concluded that "it [could not] possibly be determined or demonstrated that cheating occurred irrespective of statistical arguments that have been made." Id. at 33. Harris also elicited testimony from Henry Morse, owner of two personnel testing companies ("Morse"), who agreed with Olinsky's findings. (Feb. 8, 2005 Hr'g Tr. at 31-46.) Morse testified that the City's expert (Fairley) used an incorrect formula in calculating the odds that Harris' test score was the result of cheating because he erroneously used Michael Harris as a model. Id. at 42. During his presentation, Morse offered the Board what he termed the proper statistical analysis, concluding that the probability of achieving the test results that occurred was actually in the vicinity of one in ten. Id.
at 43. Consequently, it was the opinion of Morse that the test results were more indicative of a coincidence than cheating.Id.
Harris called Lieutenant Paul Kennedy ("Kennedy"), Deputy Chief of the PPD, who was in charge of the investigation into the testing scandal at the time of the LEOBR hearing. (Feb. 7, 2005 Hr'g Tr. at 69-72.) He testified that Searles, in response to inquiry in connection with the investigation, had told him that she had given Prignano the source sheet prior to the sergeant's examination. Id. at 103-04. Much of Kennedy's testimony concerned a taped interview among former Commissioner John Partington ("Partington"), Prignano, and Ryan in which Prignano and Ryan "emphatically" denied giving the source material to Harris. Id. at 122-32. The Plaintiff also called retired PPD Detective Niko Katsetos ("Katsetos"). Katsetos, an active participant in the Harris investigation, had authored a summary of the aforementioned interview with Partington. (Feb. 9, 2005 Hr'g Tr. at 84-85.) In response to Plaintiff's line of inquiry as to why he failed to include the denials of Prignano and Ryan in his summary, Katsetos testified that: (1) he listened to the tape of the interview a number of times, (2) the tape was "not very good quality," and (3) he meant the summary which he drafted to be a rough sketch of the interview rather than a detailed summation. Id. at 94-95.
The Plaintiff also called Richard Rose, the Assistant United States Attorney who had prosecuted the Plunder Dome cases. Rose testified that he had known the Plaintiff and her husband socially for approximately ten years and considered them to be his friends. (Feb. 8, 2005 Hr'g Tr. at 104-05.) Rose was precluded from answering any further questions because of the so-called Touhy regulations.[11]
Another witness, Providence City Council member Balbina Young, testified regarding a meeting in which she participated in 1996 concerning promotions within the PPD. She met with several City Council members and then Director of Administration Frank Corrente to discuss certain promotions. Id. at 108-09. Tonya Harris and Michael Harris were both present at the meeting representing the interests of the Rhode Island Minority Police Association ("RIMPA"). The Plaintiff was there to suggest the names of two individuals that RIMPA sought to have promoted to major. Although it was suggested that Harris accept a promotion to major, she declined.[12]
Next, the Plaintiff testified on her own behalf. She first discussed her relationship with Prignano while working as his subordinate for six years in the Special Investigation Bureau ("SIB").[13] She testified that she "was uncomfortable when profanities . . . were used by him . . . [and] when demeaning comments were made regarding women." (Feb. 11, 2005 Hr'g Tr. at 13-14.) However, she acknowledged that "there were times [she] was comfortable with the relationship." Id. at 14. Moreover, Harris testified that Prignano was particularly upset over her discrimination lawsuit because he was anticipating a promotion himself and was concerned that her allegations would stall his promotion. Id. at 17. In fact, stated Harris, the relationship between herself and Prignano became so hostile that she eventually had to leave the SIB in August 1995.[14]
With respect to the sergeant's examination, Harris insisted that she used vacation time to study and that she studied alone.Id. at 28-29. She testified that no one ever offered her any "assistance, documentation keys, tests." Id. at 29. Moreover, she denied ever meeting with Prignano or speaking with him relative to the exam prior to its administration. Id. at 30.
Finally, during this difficult period — with the ongoing litigation and the allegations of corruption in the promotional process — Harris admitted that "[t]here were times I taped many conversations with many officers," including her superior, Lieutenant Kennedy. Id. at 110-12.
Following the presentation of the Plaintiff's case, the Board itself called three witnesses for supplemental testimony. Nancy Santopadre Dos Reis, a Detective with the PPD ("Dos Reis"), testified that the Plaintiff had disclosed in a previous interview that she did not study for the 1996 sergeant's exam alone. (Feb. 14, 2005 Hr'g Tr. at 135-36.) Rather, in a meeting on May 20, 2003, Harris had indicated to Dos Reis that she studied for that exam in the library with her good friend — and current husband — Michael Harris. Id. at 136. After questioning a PPD Lieutenant, the Board concluded the proceedings by re-calling McNulty in order to confirm that he would go forward with these charges after hearing the testimony and witnessing the voluminous evidence over the eleven hearing days. Id. at 162.
The Board then rejected a request by the Plaintiff to re-call Dos Reis, and, following closing arguments by both parties, it deliberated and issued its decision on March 10, 2005. The Board found Harris guilty with respect to seven of the nine charges.[15] In accordance with G.L. 1956 42-28.6-11(b), the Board issued a written decision replete with findings of fact. Over twenty-four pages, the Board set forth the specific testimonial and physical evidence on which it relied in arriving at its decision.
The Board stated that it had found, by a fair preponderance of the evidence, that "Chief Prignano gave Harris the source sheet to that examination one week (approximately) before the July 27, [19]96 test." (March 10, 2005 Decision at 8.) In reaching its conclusion, the Board relied primarily on Prignano's FBI 302 statements and Plunder Dome trial testimony, as well as Ryan's deposition testimony. With respect to the reliability of these prior statements, the Board stressed that "Prignano was carefully debriefed and tested by FBI agents," and that his "credibility was tested when he testified in open court under immunity on May 13, 2002 in the U.S. District Court."[16]
In addition to the former statements of Prignano and Ryan, the Board also found significant that the Plaintiff and her future husband both scored a 93 on the examination and, moreover, that they chose the same incorrect response on five of the seven questions they got wrong. Id. at 9. Additionally, the Board's concerns in this area were corroborated by Dr. Fairley's "persuasive" and "compelling" expert testimony that the .01% likelihood of these scores resulting led to the conclusion that cheating was involved. Id. at 13.
Furthermore, relative to the conflicting testimony regarding whether the FOP actually suggested to Prignano that he give the source sheet to Harris, the Board concluded that issue was immaterial to its ultimate resolution. Id. at 12. Rather, "[t]he majority of the Board simply finds that Prignano did give Harris the source sheet before the 1996 Sergeant's exam." Id.
The Board then rendered a decision as to each of the charges set forth in the complaint, finding her guilty on seven of the nine charges.[17] By accepting advance source materials for the exam and failing to report such action to her supervisors, Harris was found guilty of breaching her duty to report information. Id. at 25. By testifying falsely before federal and state grand juries, as well as at a Garrity Hearing, the Board concluded that Harris had committed perjury, and was guilty of violating her departmental duty to maintain truthfulness.Id. With the respect to the sum of her conduct — accepting the source sheet and using that information to gain an unfair advantage on the exam — the Board found her actions constituted conduct unbecoming an officer, neglect of her duty, conduct tending to cast disrepute on the PPD, action contrary to good order and discipline, and a failure to obey laws and departmental rules. Id. at 25-27. As argued strenuously by the Plaintiff, each charge concerning which the Board made a guilty finding required proof that it was Prignano who corruptly provided her with promotional test related materials.
Section 42-28.6-11(a) of the General Laws empowers the Board to "sustain, modify in whole or in part, or reverse the complaint or charges" brought against the Plaintiff. The Board determined that Harris' actions represented "blatant dishonesty" and that "such dishonorable behavior must be swiftly and decisively addressed."Id. at 29. Accordingly, the Board sustained Chief Esserman's recommendation and held that "[t]ermination of [the Plaintiff's] employment is warranted and appropriate." Id. Thereafter, Harris filed the instant timely appeal.
 STANDARD OF REVIEW
"The Law Enforcement Officers' Bill of Rights, enacted in 1976, is the exclusive remedy for permanently appointed law-enforcement officers who are under investigation by a law-enforcement agency for any reason that could lead to disciplinary action, demotion, or dismissal." City of East Providence v. McLaughlin,593 A.2d 1345, 1348 (R.I. 1991) (citing Lynch v. King, 120 R.I. 868, 870
n. 1, 391 A.2d 117, 119 n. 1 (1978)). Under this Act, any law enforcement officer facing charges that may result in punitive action may request a hearing before a committee comprised of three active law enforcement officers. G.L. 1956 §§ 42-28.6-1 and42-28.6-4. This committee has broad discretion to sustain, modify, or reverse the charges. See § 42-28.6-11; see alsoCulhane v. Denisewich, 689 A.2d 1062, 1064-65 (R.I. 1997) (citing State Dep't of Envtl. Mgmt. v. Dutra, 401 A.2d 1288
(1978) (citations omitted)).
An officer may appeal to the Superior Court from a decision made by the committee. Sec. 42-28.6-12. For the purpose of such an appeal, the committee is "deemed an administrative agency and its final decision shall be deemed a final order in a contested case within the meaning of §§ 42-35-15 and 42-35-15.1." Sec.42-28.6-12(a). Accordingly, this Court must apply the standard of review as set forth in § 42-35-15(g):
 "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
When reviewing an agency decision pursuant to § 42-35-15, the Court may not substitute its judgment for that of the agency with respect to credibility of witnesses or the weight of evidence concerning questions of fact. Ctr. for Behavioral Health, R.I.,Inc. v. Barros, 710 A.2d 680, 684 (R.I. 1998). As such, the Court's review is confined to "an examination of the certified record to determine if there is any legally competent evidence therein to support the agency's decision." Johnston AmbulatorySurgical Assocs., Ltd. v. Nolan, 755 A.2d 799, 805 (R.I. 2000) (quoting Barrington Sch. Comm. v. R.I. State Labor RelationsBd., 608 A.2d 1126, 1138 (R.I. 1992)); see also NewportShipyard v. R.I. Comm'n for Human Rights, 44 A.2d 893, 896-97
(R.I. 1984). Competent or substantial evidence is that which a reasonable mind might accept to support a conclusion. NewportShipyard, 44 A.2d at 897 (quoting Caswell v. George ShermanSand Gravel Co., 424 A.2d 646, 647 (R.I. 1981)). The Court "may reverse [the] findings of the administrative agency only in instances where the conclusions and the findings of fact are totally devoid of competent evidentiary support in the record, or from the reasonable inferences that might be drawn from such evidence." Bunch v. Bd. of Review, 690 A.2d 335, 337 (R.I. 1997) (citations omitted). In this respect, the Court's review is both limited and highly deferential. Culhane, 689 A.2d at 1064. However, the Court reviews questions of law de novo.Narragansett Wire Co. v. Norberg, 118 R.I. 596, 376 A.2d 1
(1977).
 DISCUSSION
As discussed in greater detail below, the City urges this Court to extend great deference to the Board's decision which was reached only after a lengthy hearing at which the Plaintiff was represented by counsel, was afforded at least a facial opportunity to challenge the City's evidence, and was further allowed to offer substantial rebuttal evidence. Plaintiff's principal attack on the Board's decision is one based upon the constitutional guarantee of due process. She claims that every particularized charge against her was based upon a finding that Prignano supplied her with the test materials and that the finding was based solely upon the hearsay statements of an inveterate liar. Accordingly, she maintains that to deprive her of her property right of employment without an opportunity to confront her accuser deprives her of due process guaranteed by both the Rhode Island Constitution and the 14th Amendment.
The instant appeal, as well as the LEOBR hearing process which precipitated the appeal, is not of the routine variety. In fact, this Court's research has failed to find precedent in any jurisdiction for the procedure followed by the Board in reaching its decision. At base, this Court is asked to decide whether the City can properly rely upon uncorroborated, hearsay evidence which was given to investigative agents or at trial proceedings unrelated to this dismissal action when the Plaintiff has been deprived of any opportunity to confront, or cross-examine, her accuser. Clearly, the testimony of admitted liars can be used by fact finders, even juries in criminal cases, to support guilty verdicts. See, e.g., State v. Hazard, 797 A.2d 448 (R.I. 2002). However, in a criminal trial a defendant is guaranteed a right to confront and cross-examine all witnesses pursuant to the 6th Amendment. The case at bar concerns review of an administrative proceeding at which rules of evidence are relaxed. However, this begs the principal question confronting this Court on appeal: can a LEOBR Board, when deciding with finality the future career of a police officer, properly rely upon hearsay evidence as the sole or principal basis for its findings? Or, despite a well documented attempt by the Board to afford a lengthy and deliberate hearing, have Plaintiff's due process rights been violated by reason of her inability to confront her accuser?
The Plaintiff requests that the Court vacate and reverse the Board's decision because her constitutional right to due process was violated when the Board admitted hearsay statements into evidence and relied on those statements in making its findings. Furthermore, the Plaintiff alleges that the decision was made upon unlawful procedure because the Board refused the Plaintiff's request to call certain rebuttal witnesses at the end of the hearings. The Plaintiff also avers that certain language within the decision was arbitrary and capricious and representative of an unwarranted exercise of discretion by the Board. Finally, Harris claims that the statute of limitations precludes the enforcement of the charge against her for failing to report information.
 Hearsay Evidence and Due Process in the Administrative Agency Context
The Plaintiff claims that her constitutional right to due process was violated when the Board agreed to admit both Prignano's and Ryan's[18] former testimony into evidence in the course of her LEOBR hearing. Specifically, Harris avers that the Board's reliance on hearsay statements breached her constitutional right to a fair hearing because neither she, nor anyone on her behalf, had the opportunity to confront, or cross-examine, her accusers.
Both the United States and the Rhode Island Constitutions provide that the state shall not "deprive any person of life, liberty, or property, without due process of law." United States Const., Amend. XIV, § 1; Rhode Island Const., Art. I, § 2. When an administrative body, such as a LEOBR hearing committee, reviews disciplinary decisions, such review "is governed by requirements that . . . the employee is entitled to due process of law. . . ." Isidore Silver, Public Employee Discharge andDiscipline, § 7.1 at 7-4 (1990). In addition, the LEOBR Act itself provides for certain procedural safeguards, as follows:
 "If the investigation or interrogation of a law enforcement officer results in the recommendation of some action, such as demotion, transfer, dismissal, loss of pay, reassignment, or similar action which would be considered a punitive measure, then, before taking such action, the law enforcement agency shall give notice to the law enforcement officer that he or she is entitled to a hearing on the issues by a hearing committee." Sec. 42-28.6-4.
It is undisputed, on the instant facts, that Harris was given notice and a hearing in accord with the statutory mandate. Her contention, rather, centers on the particular evidence admitted in the course of the hearing she received.
With respect to the admission of evidence at a LEOBR hearing, the LEOBR Act provides that "[e]vidence which possesses probative value commonly accepted by reasonable and prudent men in the conduct of their affairs shall be admissible and shall be given probative effect."[19] The evidence in question undoubtedly had probative value as the Board's decision reflects that its guilty findings were largely predicated on Prignano's and Ryan's statements alluding to Harris' receipt of the source materials. A review of the instant record reveals that the Board acted cautiously in determining whether this evidence "possesses probative value" and whether it was the type of evidence "commonly accepted by reasonable and prudent men in the conduct of their affairs." However, this Court finds that, under the unique facts of this case, the Board's reliance upon prior hearsay statements violated both constitutionally guaranteed due process and state law.
Rhode Island General Laws § 42-28.6-9, part of the statutory scheme which establishes procedures for LEOBR hearings, states that "[e]very party has the right of cross-examination of the witnesses who testify, and may submit rebuttal evidence." The City contends that, because Prignano and Ryan did not testify at the LEOBR hearing, the plaintiff had no right to cross-examine them. Yet, in nearly the same breath, the City insists that thetestimony given by these corrupt former officers at earlier times was reliable because these witnesses had been sworn and were subject to possible cross-examination.
As such, the Board indicated that it would admit these statements as evidence and "give it its appropriate weight." (Feb. 2, 2005 Hr'g Tr. at 156.) The Board members were of the opinion that they were "capable of deciding how credible or lack of credible [sic] or how good or not good the information was."Id. Subsequently, in its decision, the Board emphasizes that it had carefully analyzed the reliability of the statements and determined that because the prior testimony was "taken under oath, with aid of counsel," that it was of the type "commonly accepted by reasonable and prudent men in the conduct of their affairs." (March 10, 2003 Decision at 5.)
As recently observed in another LEOBR appeal, "[a]administrative review of disciplinary decisions is governed by requirements that agencies are bound by their own rules, that review bodies comply with all statutory and other legal requirements, and that the employee is entitled to due process of the law in review proceedings." Pinto v. Roy, No. PC02-2398, 2003 WL 21297132 *7 (P.C.S.C. May 27, 2003) (inside quotations and citation omitted). Here, the Board's procedure violated both the spirit and express language of § 42-28.6-9. Accordingly, the decision was "in violation of . . . a statutory provision and made upon unlawful procedure. . . ." Sec. 42-35-15(g) (1) and (3).
Of course, it is well-established in Rhode Island that a state agency need not rigidly adhere to the rules of evidence when conducting its hearing process. See, e.g., Foster-GlocesterRegional Sch. Comm. v. Bd. of Review, Dep't of Labor andTraining, 854 A.2d 1008, 1018-19 (R.I. 2004); DePasquale v.Harrington, 599 A.2d 314, 316-17 (R.I. 1991); Beauchamp v. DeAbadia, 779 F.2d 773, 775-76 (1st Cir. 1985). This is particularly true in the context of admitting hearsay evidence. As our Supreme Court has explained:
 "The admission of hearsay evidence in an administrative forum is reflective of the traditional division of function between judge and jury. Many of the rules surrounding the exclusion of hearsay in jury trials are meant to prevent juries, uninitiated in the evaluation of evidence, from hearing unreliable or confusing testimony and rendering a verdict based on such evidence. See [sic] McCormick on Evidence, §§ 351-352 at 1006-12. Such protection is far less necessary when evidence is presented to a judge sitting without a jury or, as in this case, a hearing officer with substantial expertise in the matters falling within his or agency's jurisdiction."
DePasquale, 599 A.2d at 316; see also 2 Koch,Administrative Law and Practice, § 5.52[3] at 175 (1997) ("[t]he general rule remains that hearsay evidence is admissible in administrative hearings.").
In the case at bar, the Board admitted into evidence Prignano's statements, along with his trial testimony, and Ryan's deposition testimony. Based on their experience and expertise, the Board members made a determination of the reliability of these statements and the reasonable amount of weight to afford such statements. Such action, however, represented a violation of the LEOBR statutory scheme.
The Plaintiff's appeal is centered on her claim that the Board's reliance on hearsay testimony which was untested by Harris, or by anyone representing common interests, deprives her of the process that is due her under the auspices of both the Rhode Island and the Federal Constitutions. This claim is made all the more serious by Prignano's widespread reputation for dishonesty. In support of her argument, Harris cites a number of cases from other jurisdictions, as well as treatises, which underscore the significance of cross-examination as a tool in seeking fairness and truth in adjudicative proceedings. In one such case, a state appellate court stated the following:
 "Although administrative agencies are not bound by the technical common law rules of evidence, they must observe the basic rules of fairness as to parties appearing before them. (citation omitted.) One of these basic rules of fairness is that in an adversary proceeding before an administrative board, the opportunity for reasonable cross-examination must be allowed."
American Radio-Telephone Service, Inc. v. Public ServiceComm'n, 365 A.2d 314, 320 (Md. 1976); see also PrinceGeorge's County, Maryland v. Hartley, 822 A.2d 537, 545 (Md. 2003) (administrative agencies "must observe basic rules of fairness as to the parties appearing before them so as to comport with the requirements of procedural due process"); DolphinoCorp. v. Alcoholic Beverages Control Comm'n, 559 N.E.2d 1261,1262 (Mass.App.Ct. 1990) (hearing board cannot rely on untested hearsay statements submitted by an agency where that agency does not send a representative to the hearing to prove its case but, rather, simply forwards a copy of findings it had previously made); 58 Am. Jur. Witnesses, § 610 (1948) ("[t]he cross-examination of witnesses is one of the safeguards to accuracy and truthfulness").
In response, the City has failed to cite a single case wherein an administrative decision similar to this was based solely on hearsay evidence. Admittedly, the Rhode Island Supreme Court has recognized that due process is a "flexible concept" and that "not all situations calling for procedural safeguards call for the same kind of procedure." In Re James C., 871 A.2d 940, 943
(R.I. 2005). And it has been stated by other courts that "[t]he right to cross-examination, although important and useful, is not absolute" in the administrative context. Beauchamp,779 F.2d at 775 (citing Wolff v. McDonnell, 418 U.S. 539, 568-69 (1974)) (citation omitted). However, this is neither a routine administrative appeal nor a mere disciplinary proceeding. This is a proceeding which revoked Plaintiff's lifetime calling to be a police officer. In fact, at eighteen years of service, Harris was approaching possible retirement.
This Court is in agreement with the sentiments of other state courts which have had similar important, career-related decisions before them. As one Court noted,
 "[e]ven where hearsay is sufficiently reliable to be admissible and might be relied upon when the consequences of the decision would be minor, that same hearsay might not be relied upon when the consequences of the decision would be a profound impact on, for example, the ability of an individual to pursue a chosen profession."
Reguero v. Teacher Standards and Practices Comm'n,
8322 P.2d 1171, 1182-83 (Or. 1991); see also Travers v. BaltimorePolice Dep't, 693 A.2d 378 388-89 (Md.Ct.Spec.App. 1970) (concluding that "there is some force behind [Officer Travers'] argument that in a hearing to determine whether he would be permitted to retain his livelihood, due process requires that he be afforded the opportunity to cross-examine a complaining witness").
The Board's dependence on hearsay evidence is of even greater concern here. Prignano, the source of the hearsay utterances, and the only witness who can directly establish that it was he who gave Plaintiff the test materials, is conceded to be unreliable and a liar. Even the officer charged with the investigation of the allegations testified before the Board that Prignano was a liar, vindictive, and would do and say whatever he wanted to serve his own needs. Can untested, hearsay utterances from such a person be lawfully used to remove an eighteen-year veteran from the police force? Not if this Court is to give proper observance of constitutional guarantees and fundamental fairness.[20]
Of course, it is not for this Court to declare a per se rule regarding the use of hearsay evidence at LEOBR proceedings. Rather, this decision is limited to a situation where the PPD and the Board relied upon the hearsay utterances of a known liar, himself the subject of a criminal investigation.
The City also argues that even if this Court totally discounts the evidence given by Prignano and Ryan, sufficient reliable evidence remains to support a finding that Harris cheated on the promotional examination. However, Plaintiff has pointed out that the complaint against Harris is not — in any one of the charges — an allegation of generalized cheating.[21] Because of the manner in which the charges were drafted, this Court can uphold the Board's decision only if there was more than a scintilla of evidence to support the conclusion that Harris corruptly received test materials from Prignano. This Court cannot engage in fact finding and rest an affirmance on an independent finding that Harris engaged in cheating. That was not the Board's decision. As stated in approving language by our high court in SakononnetRogers, Inc. v. Coastal Res. Mgmt. Council, 536 A.2d 893 (R.I. 2001),
 "Professor Kenneth Culp Davis has commented that `[e]ven if the evidence in the record, combined with the reviewing court's understanding of the law, is enough to support the order, the court may not uphold the order unless it is sustainable on the agency's findings and for the reasons stated by the agency.'"
Id. at 896-97 (quoting 3 Davis, Administrative Law Treatise,
Section 14.29 at 128 (2nd. Ed. 1980). Here, of course, the Board answered the charges made and, as to each charge, found that Harris had obtained test materials from Prignano, a conclusion apparently derived from the hearsay statements attributed to Prignano and Ryan.
 Plaintiff's Remaining Claims
In light of this Court's holding that the Board violated Plaintiff's substantial constitutional due process rights and disregarded the statutory scheme which mandates that a charged police officer be afforded certain procedural rights, this case will be remanded to the Board for further proceedings. However, this Court will briefly discuss Plaintiff's other arguments which she maintains should result in reversal.
 The Ability to Call Rebuttal Witnesses
The Plaintiff requests that this Court vacate the Board's decision because the decision was made upon unlawful procedure. Following the presentation of the City's case and Harris' case, the Board itself called three witnesses. It called Detective Dos Reis, whose only relevant testimony was that Harris had told her in the past that the Plaintiff had studied for the sergeant's examination with Michael Harris, a statement which contradicted the Plaintiff's own LEOBR hearing testimony. (Feb. 14, 2005 Hr'g Tr. at 136.) A second witness, PPD Lieutenant Timothy Lee, testified regarding a 1999 incident that was not relevant to the Board's ultimate decision. Finally, the Board re-called Sergeant McNulty simply to reaffirm his opinion that bringing the charges against Harris was the proper course. Id. at 162.
Subsequently, the Plaintiff made a request to the Board to call rebuttal witnesses and introduce rebuttal evidence relating solely to Dos Reis' testimony. (Feb. 15 Hr'g Tr. at 4-5.) The Board members discussed the request and determined that it would allow Harris to submit additional evidence but not present any additional witnesses. Id. at 10. The Plaintiff now claims that the Board's precluding the calling of this additional witness constitutes an unlawful procedure and requests that the Court reverse the Board's decision as a consequent. Harris directs the Court to § 42-28.6-9, which provides every party to a LEOBR hearing the right to "submit rebuttal evidence." Plaintiff submitted a great volume of evidence to rebut the City's case, and it is this Court's opinion that the Board acted within its statutory authority in rejecting Harris' request to offer yet more testimonial evidence. The Board made a measured determination to accept the Plaintiff's additional evidence and to afford both Dos Reis' testimony and the additional evidence the "appropriate probative value." (Feb. 15, Hr'g Tr. at 10.)
Furthermore, the LEOBR Act plainly states that "[t]he hearing committee conducting the hearing shall give effect to the rules of privilege recognized by law, and may exclude incompetent, irrelevant, immaterial, and unduly repetitious evidence." G.L. 1956 § 42-28.6-6(a). Therefore, Harris' contention that the Board violated statutory provisions controlling the evidentiary procedure is without merit. To the contrary, this Court is satisfied that the Board acted within its authority in determining that further testimony would be "irrelevant, immaterial, and unduly repetitious."
Moreover, with respect to new evidence at administrative hearings, only "when good cause has been shown, such as the finding of new and material evidence" will reopening of a hearing be permitted. 4 Jacob A. Stein et al., Administrative Law, § 30.01 at 30-13, 30-14 (2005). Most courts consider such "material" evidence as that which would alter the agency's ultimate decision. See Bernal-Garcia v. INS, 852 F.2d 144
(5th Cir. 1988) (new evidence showing that petitioner likely to be persecuted upon deportation merits consideration by agency); King v. Califano, 599 F.2d 597 (4th Cir. 1979) (remand for further proceedings appropriate where new evidence might change the Secretary's decision). Cf. Beck v. Matthews,601 F.2d 376 (9th Cir. 1978) (new evidence did not create the substantial impact necessary for a remand). As such, given the voluminous record in the instant proceeding, it appears highly unlikely that the impact generated by discrediting Dos Reis' testimony relative to Harris' study habits prior to the sergeant's examination would have altered the ultimate disposition of the case. However, incident to the remand which is ordered herein, the Board may wish to reconsider Plaintiff's request to augment the evidentiary record.
 Characterizing the Plaintiff
Harris further contends that the Board made baseless character judgments about her and founded its decision thereon. Therefore, the Plaintiff argues, she has had substantial rights prejudiced because the arbitrary and capricious nature of the decision constitutes an unwarranted exercise of discretion by the Board. Plaintiff's claim is without merit.
It is a generally accepted appellate procedure that the determination of credibility by the trier-of-fact, who was able to see and hear the witness, must be accorded great respect upon review. See, e.g., In re Dissolution of Anderson, Zangari Bossian, 888 A.2d 973 (R.I. 2006); Ctr. For Behavioral Health,R.I., Inc., 710 A.2d at 684; Lonardo v. Palmisciano,97 R.I. 234, 197 A.2d 274 (1964). Even "positive uncontroverted testimony may be rejected if it contains inherent improbabilities or contradictions." Laganiere v. Bonte Spinning Co., Inc.,103 R.I. 191, 194, 236 A.2d 256, 258 (1967) (citation omitted). Moreover, "testimony may also be disregarded if it lacks credence or is unworthy of belief, especially if the testimony is that of a party to the litigation." Id. (citations omitted). The fact finder may not, however, reject testimony arbitrarily or capriciously. Laganiere, 103 R.I. at 195, 236 A.2d at 258. Rather, rejecting testimony on credibility grounds should entail a clear statement of "the reasons which underlie [the] rejection." Id.
In the case at bar, the Board did not find the Plaintiff's testimony to be credible. (March 10, 2005 Decision at 20.) In support of its finding in this regard, the Board itemized a number of reasons therefore.[22] As discussed at length above, the record contains evidence that directly contradicts the Plaintiff's assertion that she did not cheat on the promotional exam. Consequently, the Board's decision to discredit Harris' testimony was neither arbitrary or capricious, nor representative of an unwarranted exercise of discretion.
 The Statute of Limitations
Lastly, the Plaintiff maintains that the Board's decision was in violation of statutory provisions with respect to its finding that Harris was guilty of violating her duty to report information as alleged in Charge 1. Accordingly, Plaintiff requests that this Court vacate the decision.
Rhode Island General Laws § 42-28.6-4(a) provides, in pertinent part: "[d]isciplinary action for violation(s) of departmental rules and/or regulations shall not be instituted against a law enforcement officer under this chapter more than three (3) years after such incident, except where such incident involves a potential criminal offense." The Plaintiff notes that the first charge — failure to report information to her superiors — stems from her receipt of the source sheet prior the July 1996 sergeant's examination. The complaint citing this charge was issued on May 27, 2004. Therefore, the statute of limitations as to this particular charge had run prior to its issuance. Accordingly, the Board's guilty finding on this charge must be vacated.[23]
The Board found that the Plaintiff had violated six PPD regulations in addition to Charge 1. It was determined that Harris was guilty of failing to maintain truthfulness, committing conduct unbecoming an officer and casting disrepute on the department, neglecting her duty, acting contrary to good order and discipline, and failing to obey laws and rules. Pursuant to its LEOBR Act authority, the Board adopted Esserman's recommendation to terminate Harris based on its findings of fact.See § 42-28.6-11(a); see also March 10, 2005 Decision at 28-29. Consequently, this Court's vacating the Board's guilty finding with respect to Charge 1 does not impair or affect the Board's ultimate disciplinary decision.
 CONCLUSION
After a review of the entire record, this Court finds that the Board's conduct of the hearing violated Plaintiff's constitutional due process rights as well as express statutory provisions of the LEOBR Act. As a result, substantial rights of the Plaintiff were prejudiced. Accordingly, this Court hereby vacates the decision of the Board and remands the matter for further consideration in accordance with §§ 42-28.6-12 and42-35-15.[24] In reconsidering the case, and in rendering any future decision, the Board is precluded from relying on the prior testimony or statements given by Prignano, Ryan, or Hames. Additionally, the Board may choose to augment the record with additional evidence adduced at a hearing as it deems necessary. This Court shall retain jurisdiction. Plaintiff's counsel shall submit an appropriate order for entry.
[1] This justice has disclosed to the parties his familiarity, indeed his former working relationship, with many of the individuals involved in the instant litigation. The parties expressed no objection to this justice presiding over the case.
[2] The result of the investigation eventually led to the arrest and conviction of former City of Providence Mayor Vincent Cianci in what has been commonly termed the "Plunder Dome" cases.
[3] See Bolduc v. United States, 402 F.3d 50, 52 (1st
Cir. 2005) (describing 302 reports as FBI memoranda summarizing relevant case evidence). A FBI 302 report is not usually a statement of a potential witness. Rather, it memorializes, and typically summarizes, what a FBI special agent understands a potential witness to have disclosed.
[4] Id. In 1996, the Plaintiff's name was Tonya King. She changed her name to Tonya Harris upon her marriage to Michael Harris in 2000. (Feb. 11, 2005 Hr'g Tr. at 7.)
[5] Id. Harris had sat for the sergeant's examination in 1994 and finished with a score that placed her in the top ten which made her eligible to receive the promotion to sergeant. (Feb. 11, 2005 Hr'g Tr. at 14.) After other officers filed a grievance complaining that the questions on that test were unfair, the scoring was revamped, with the result that Harris was bumped from the top ten. Id. Harris then filed a grievance with her union and a lawsuit in Federal Court, claiming racial discrimination in the promotional process. Id.
[6] Harris was not a participant in that proceeding. Furthermore, no PPD officer was a defendant.
[7] See generally Garrity v. New Jersey, 385 U.S. 493
(1967) (establishing process in which law enforcement departments elicit testimony from officers by granting immunity from potential criminal liability related to the testimony).
[8] This provision of the LEOBR Act provides that any disciplinary action for violations of department rules and regulations must be brought within three years after the incident occurred. Sec. 42-28.6-4(a).
[9] See R.I.R. Evid., 804(a) (1). The rule provides that a declarant will be considered "unavailable" if he or she "is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement."
[10] Jan. 31, 2005 Hr'g Tr. at 151; Feb. 1, 2005 Hr'g Tr. at 48. The purpose of the meeting was to ensure that there were an equal number of questions on the upcoming examination from each of four specified sources. (Jan. 31, 2005 Hr'g Tr. at 151-52.) These source restrictions would make certain that the test results would be the product of a fair process negotiated between the PPD and the FOP. Id. at 152.
[11] See generally, United State ex rel. v. Touhy,340 U.S. 462 (1951) (recognizing unique testimonial privileges for government employees). See 28 C.F.R. Section 16.21 et. seq.
[12] Id. at 109. Young testified that the Council presented the names of the individuals to former City of Providence Mayor Vincent Cianci, who was participating via speakerphone. Id. The mayor, however, wanted the Plaintiff to receive the promotion. This opportunity was conveyed to Harris, who responded that she did not want to be handed the promotion. Id. at 111. Rather, Young testified that Harris insisted she would prefer to earn the promotion on her own merit. Id.
[13] The SIB is a division of the PPD which concentrates exclusively on narcotics, vice, prostitution, and some organized crime matters. (Feb. 3, 2005 Hr'g Tr. at 84.)
[14] Feb. 11, 2005 Hr'g Tr. at 22. Harris asked to be transferred to Prosecution. Id. She was in Prosecution only for a short time before being transferred once again, this time to the Attorney General's Office. Id. at 25. In April of 1996, after openly advocating for increases in minority recruitment, she was transferred to the Human Resources Department to help with that cause. Id. at 25-26, 77-78. In each case, Harris was given the opportunity to decline the reassignment but chose not to. Id. at 78.
[15] Specifically, Harris was found guilty of violating the following rules and regulations: the duty to report information; truthfulness; conduct unbecoming an officer; neglect of duty; conduct casting disrepute on the department; acting contrary to good order and discipline; and failing to obey laws and department rules. (See March 10, 2005 Decision at 3.) The Board found that the charge of malfeasance was duplicative and that Harris was not guilty of soliciting influences. Id.
[16] Id. The Board also makes reference to Rule 3.3 of the Supreme Court Rules of Professional Conduct, which prohibits any lawyer from knowingly offering evidence the lawyer knows to be false as further assurance that Prignano's testimony in the Plunder Dome Case was reliable. Id.; see also Rule 3.3 of Article V of the Rules of Professional Conduct.
[17] The fifth charge against Harris, alleging malfeasance, was declared "duplicitous," while Harris was deemed "not guilty" of the soliciting influence, the ninth and final charge against her. (March 10, 2005 Hr'g Tr. at 3.)
[18] Ryan's sworn deposition testimony is of little value even if considered. Ryan merely testified that Prignano told him that Prignano gave Harris test related materials. This testimony, given in an unrelated matter, was in direct conflict with statements which both Ryan and Prignano gave to the police commissioner.
[19] Sec. 42-28.6-6. "Probative evidence" is "[e]vidence that tends to prove or disprove a point in issue." Black's LawDictionary 579 (7th ed. 1999).
[20] "The basic concept of due process of law is found in theFourteenth Amendment of the United States Constitution and article 1, section 2 of the Rhode Island Constitution, both of which prohibit the state from depriving any person `of life liberty, or property, without due process of law.'" In reStephanie B., 826, A.2d 985, 993 (R.I. 2003). It goes without saying that a public employee has a legitimate claim of entitlement to continued employment absent sufficient cause for discharge. See Lynch v. Gontarz, 386 A.2d 184 (R.I. 1978).
[21] Were this the case, a ruling by this Court would be more easily reached.
[22] The Board determined the following: that Harris had not been truthful in prior testimony before the Grand Jury and at herGarrity Hearing; that she mischaracterized her relationship with Prignano and her tenure in the SIB in her testimony before the Board; and that she omitted certain information from her testimony to benefit her position, such as the help she received from Searles prior to the sergeant's exam and her knowledge as to what a source sheet is. (March 10, 2005 Hr'g Tr. at 20-23.)
[23] The Plaintiff makes the same statute of limitations argument regarding the ninth and final charge — soliciting influences. The Board, however, found Harris not guilty of this offense. Therefore, the issue is moot.
[24] This Court cannot help but comment on the laudatory intent behind the City's effort to rid the Providence Police Department of officers who are perceived to be corrupt. However, it is sadly ironic that, in attempting to purge the corrupt from its police ranks, the City has chosen to depend upon the untested statements of the disgraced, former Chief of Police who was, in large part, responsible for the corruption at issue here. Regardless, the Board could certainly rely upon Prignano's testimony if Harris had not been deprived of her opportunity to challenge it. These events supply a sound basis for revising the LEOBR statutory scheme in such a manner that would provide for grants of use immunity where necessary. See G.L. 1956 § 12-17-15 (setting forth the law of immunity in Rhode Island); see also Ferrellv. Wall, 889 A.2d 177, 187 (R.I. 2005) (discussing the law of immunity as it pertains to civil proceedings).